UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GREGORY BROADY, | : | CIVIL ACTION |
| Plaintiff | : | NO. 1:06-cv-792 (CKK) |
| v. | : | |
| ZANZIBAR ON THE WATERFRONT, LLC, ALLEN IVERSON and JOHN DOE, | : | |
| Defendants. | : | |

**DEFENDANT ALLEN IVERSON'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

Pursuant to Fed. R. Civ. P. 56 and LCvR 7(h) and 56.1, Allen Iverson, Defendant in the above-captioned matter (hereinafter referred to herein as "Mr. Iverson"), by and through his undersigned counsel, Alan C. Milstein and Matthew A. Tucker of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., hereby submits, in support Mr. Iverson's accompanying Motion for Summary Judgment, the following Statement of Material Facts as to which contends no genuine issue of material facts exists, and says, states, and avers as follows:

**II.  STATEMENT OF MATERIAL FACTS**

1. The events in question took place on the evening of June 4, 2004 at Zanzibar on the Waterfront, LLC ("Zanzibar"), nightclub located on the waterfront in Southwest Washington DC, where Mr. Broady and Mr. Iverson were both present as patrons.[1]

---

[1] Exhibit A at ¶¶1-3. It is undisputed that both Mr. Broady and Mr. Iverson were at Zanzibar on the evening in question.

2. According to Plaintiff's Complaint, while the Plaintiff and Mr. Iverson were both present at Zanzibar, an individual wearing a shirt indicating he was "Security" and identified in the Complaint as "John Doe" began to establish control by "indicating which individuals and patrons go to what parts of the bar and locations,"[2]

3. According to Plaintiff's Complaint and deposition testimony, John Doe "came onto the premises at about the same time as Mr. Iverson" on the evening in question.[3]

4. Plaintiff has testified that the individual identified in his Complaint as John Doe was the same individual who struck him on the evening in question.[4]

5. The Plaintiff in this case did not know whether the individual identified in the Complaint as John Doe was working for Mr. Iverson or Defendant Zanzibar on the evening in question.[5]

6. Neither the Plaintiff nor anyone else saw Mr. Iverson give directions to the individual identified in the Complaint as John Doe.[6]

7. Plaintiff describes John Doe as a black man wearing black jeans and a black T-shirt that said "Security" across the front in gold lettering.[7]

8. Plaintiff testified that he had seen security guards at Zanzibar on previous occasions wearing similar black T-shirts that said "Security" across the front in gold lettering.[8]

9. It was the custom and/or practice of Defendant Zanzibar to hire additional security personnel when they knew a celebrity would be in attendance.[9]

---

[2] Id. at ¶5.
[3] Exhibit B at 57:2-7 (Plaintiff stated that Mr. Iverson and "John Doe" arrived "right around the same time.")
[4] Id. at 118:2-11
[5] Id, at 57:8-12; 120:14-16; 121:9-13.
[6] Id. at 120:14-16.
[7] Id. at 54:1-16.
[8] Id. at 58:17-60:11.

10. It was known to the Plaintiff and to Defendant Zanzibar that Mr. Iverson would be in attendance on the evening in question prior to his arrival.[10]

11. At least one owner of Zanzibar "assume[d]" that Zanzibar hired additional security personnel on the evening in question.[11]

12. Plaintiff was led to believe that John Doe's boss on the evening in question was an individual who had dreadlocks and was dressed differently that John Doe.[12]

13. There is no evidence, be it deposition testimony or otherwise, that the Plaintiff took any actions based on a belief that John Doe was acting with the authority of Mr. Iverson.

14. Plaintiff testified that he was trying to back into the VIP area where he had left his cell phone when he first encountered the individual who allegedly attacked him without provocation.[13]

15. There is no evidence in the record that suggests that Mr. Iverson or any of his agents selected or hired John Doe to provide security on the evening in question.

16. There is no evidence in the record that suggests that Mr. Iverson or any of his authorized John Doe to provide security on the evening in question.

17. There are no facts of record indicate that Mr. Iverson or any of his agents paid John Doe to provide security on the evening in question.

18. There is no evidence in the record that suggests that Mr. Iverson had the power to discharge John Doe.

---

[9] Exhibit G at 57:15-58:6.
[10] Exhibit B at 52:1-21.
[11] Exhibit G at 57:15-58:6.
[12] Exhibit B at 63:22-64:17; 65:1-66:3.
[13] Id. at 62:14-67:13

19. There is no testimony that Mr. Iverson himself saw John Doe's alleged attack of the Plaintiff.

20. Mr. Iverson himself has denied witnessing any such attack.[14]

21. Plaintiff stated that there were "quite a few people between the security guy and [Mr. Iverson]" at the time he was attacked by John Doe.[15]

22. There is no evidence that suggests that Mr. Iverson furnished any equipment for John Doe.

23. There is no evidence that suggests that Mr. Iverson had previously hired John Doe or that he even knew him.

24. There is no evidence that annual leave was afforded to John Doe by Mr. Iverson.

25. There is no evidence that John Doe accumulated retirement benefits.

26. There is no evidence that Mr. Iverson paid John Doe's social security taxes.

27. There is no evidence that Mr. Iverson had any reason to believe that John Doe had previously behaved in a dangerous or incompetent manner or that he had a propensity for violence.

28. There is no evidence to suggest that a detailed criminal history search of John Doe would have been able to predict whether John Doe had any dangerous propensities.

29. Mr. Wendall Evans, who is believed to have been the individual responsible for overseeing Zanzibar's security operations in June of 2004, had previously encountered Mr. Iverson at Zanzibar on at least two occasions prior to the evening in question.[16]

---

[14] See Exhibit D at ¶8 ("I have no recollection of ever being at the Zanzibar where an altercation occurred involving one of my security, anyone traveling with me, or anyone at all.")
[15] Exhibit B at 122:3-17. This issue will be re-addressed in Part III(B)(2) below.
[16] Exhibit E at 34:17-41:9

30. Mr. Evans never experienced any problems with Mr. Iverson or his security in the at Zanzibar prior to the evening in question (although he could not recall seeing Mr. Iverson's security on the evening in question and may not have been at Zanzibar on that date).[17]

31. There is no evidence of record that Mr. Iverson was aware that John Doe behaved in a dangerous or incompetent manner on the evening in question.[18]

32. Plaintiff described the area in which he was attempting to re-enter when he encountered John Doe as an area "to the right of the bar…[a]nd it has like a glass or something there and it has two pillars. And I seen the personnel posted. One was at the pillar. One was at the glass to block one side. There was another person on the other side."[19]

33. Mr. Daly described the same area as "an area of the Sky Club that's somewhat secluded. It's separate. If you think of the Sky Club being in an L shape, it would be the bottom leg of the L and it's separated by metal curtains. So that is an area that's the most secluded in the Sky Club" and "there are two metal curtains that provide entrance and exit to this particular secluded area. Both -- there were two gentlemen at these, by these curtains."[20]

34. Mr. Olasehinde described the same room as "a section called the MJ room, which the celebrities or whoever is hosting the event will have that area. It would be cordoned off to just them and their guests, I guess. And the rest of the sky club would be open to the general public or to invited guests. But there's a particular area which most of the celebrities have for themselves or people that they might invite to come in to that area…..It's -- it's got mirrors. It's looking the monument. It's got two entrances, which you can block off or which sometimes it

---

[17] Id.
[18] Exhibit D at ¶8.
[19] Exhibit B at 58:4-8.
[20] Exhibit F at 56:12-58:1.

5

has a curtain, a see-through type curtain. And sometimes security is posted at them doors to -- well, security is normally posted at them doors."[21]

                                                             Respectfully submitted,

                                                             **SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.**

Dated:  January 16, 2008          By:  */s/ Alan C. Milstein*
                                                                  Alan C. Milstein, Esquire
                                                                  Matthew A. Tucker, Esquire
                                                                  Fairway Corporate Center
                                                                 4300 Haddonfield Road - Suite 311
                                                                 Pennsauken, NJ 08109
                                                                 Telephone: (856) 662-0700
                                                                 Facsimile: (856) 488-4744
                                                                 *Attorneys for Defendant Allen Iverson*

---

[21] Exhibit G at 84:22-85:19