## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GREGORY BROADY, | : CIVIL ACTION |
| Plaintiff | : NO. 1:06-cv-792 (CKK) |
| v. | : |
| ZANZIBAR ON THE WATERFRONT, LLC, | : |
| ALLEN IVERSON and JOHN DOE, | : |
| Defendants. | : |

## DEFENDANT ALLEN IVERSON'S MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

**SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.**

Dated: _____January 16, 2008_____   By: _____ */s/ Alan C. Milstein*_____
Alan C. Milstein, Esquire
Matthew A. Tucker, Esquire
Fairway Corporate Center
4300 Haddonfield Road - Suite 311
Pennsauken, NJ 08109
Telephone: (856) 662-0700
Facsimile: (856) 488-4744
*Attorneys for Defendant Allen Iverson*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. ii

**TABLE OF EXHIBITS** ...................................................................................................... iv

I.     **INTRODUCTION** ..................................................................................................1

II.    **RELEVANT FACTUAL AND PROCEDURAL HISTORY** ...........................1

III.   **LEGAL ARGUMENT** ...........................................................................................1

       A.   SUMMARY JUDGMENT STANDARD .................................................................1

       B.   THIS COURT SHOULD GRANT MR. IVERSON'S MOTION FOR SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE AGAINST HIM UNDER ANY AVAILABLE THEORY OF LIABILITY .........................3

              1.   PLAINTIFF'S CLAIMS ALLEGING VICARIOUS LIABILITY AGAINST MR. IVERSON FOR THE ACTIONS OF JOHN DOE FAIL AS A MATTER OF LAW .............................................................................................4

                     a.   **Plaintiff Cannot Establish its Claim That John Doe Acted with the Apparent Authority of Mr. Iverson** ...........................6

                     b.   **Plaintiff Cannot Establish its Claim That John Doe Acted with the Actual Authority as an Agent or Employee of Mr. Iverson** ...........................................................................12

              2.   PLAINTIFF'S CLAIMS ALLEGING NEGLIGENT HIRING, TRAINING, AND SUPERVISION AGAINST MR. IVERSON ALSO FAIL AS A MATTER OF LAW .............................................................................................17

IV.    **CONCLUSION** ...................................................................................................22

## TABLE OF AUTHORITIES

## CASES

American Center for Intern. Labor Solidarity v. Federal Ins. Co., 518 F.Supp.2d 163 (D.D.C. 2007) ...............................................................................................2, 3

Ames v. Yellow Cab of D.C., Inc., 2006 WL 2711546 (D.D.C. 2006).................................13, 20

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)............................................................2, 3

Brady v. S. R. Co., 320 U.S. 476 (1943) ......................................................................................3

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................................2

District of Columbia v. Hampton, 666 A.2d 30 (D.C.1995) ......................................................13

Dovell v. Arundel Supply Corp., 361 F.2d 543 (D.C. Cir. 1966).................................................13

Drexel Burnham Lambert v. Commodities Futures Trading Comm'n., 850 F.2d 742 (D.C.Cir. 1988) ......................................................................................................7

Edwards v. Okie Dokie, Inc., 473 F.Supp.2d 31 (D.D.C. 2007) ................................................18

Fletcher v. Dist. of Columbia, No. 01-0297, 2005 WL 670676 (D.D.C. 2005) ...........................18

Fry v. Diamond Construction, Inc., 659 A.2d 241 (D.C. 1995) .................................................19

Giles v. Shell Oil Corp., 487 A.2d 610 (D.C. 1985)........................................................12, 19, 20

Gonzalez v. Internacional De Elevadores, S.A., 891 A.2d 227 (D.C. 2006).................................7

Hill v. Metropolitan, 779 A.2d 906 (D.C. 2001) ......................................................................18

Judah v. Reiner, 744 A.2d 1037 (D.C. 2000) ......................................................................12, 13

Kivanc v. Ramsey, 407 F.Supp.2d 270 (D.D.C. 2006).................................................................19

Laningham v. U.S. Navy, 813 F.2d 1236 (D.C.Cir. 1987) .............................................................3

LeGrand v. Ins. Co. of N. Am., 241 A.2d 734 (D.C. 1968) ..........................................................13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)......................................3

Murphy v. Army Distaff Foundation, Inc., 458 A.2d 61 (D.C. 1983)...........................................20

Predzin v. DC Arena Limited P'ship., No. 02-9582 (D.C.Sup.Ct. Oct. 7, 2003)...........................18

Safeway Stores, Inc. v. Kelly, 448 A.2d 856, 860 (D.C. 1982).....................................................13

Smith v. Jenkins, 452 A.2d 333 (D.C. 1982).................................................................................13

Smith v. Washington Metropolitan Area Transit Authority, 1997 WL 182286
(D.D.C. 1997) ...................................................................................................................................7

Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979) ..................................................................14

Tao v. Freeh, 27 F.3d 635 (D.C.Cir.1994)......................................................................................2

Wagshal v. Selig, 403 A.2d 338 (D.C. 1979) ..................................................................................7

Williams v. WMATA, 721 F.2d 1412 (D.C.Cir. 1983)....................................................................7

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ........................................................................................................................2

Restatement (Second) of Agency § 8 (1958)...................................................................................6

Restatement (Second) of Agency § 27 (1958).................................................................................7

Restatement (Second) of Agency § 213 (1958).............................................................................20

## <u>TABLE OF EXHIBITS</u>

Exhibit A:     Plaintiff's Complaint

Exhibit B:     Transcript of the Deposition of Gregory Broady (May 2, 2007)

Exhibit C:     Transcript of Recorded Telephonic Statement of Greogry Broady to Scottsdale
               Insurance (August 16, 2005)

Exhibit D:     Affidavit of Allen Iverson (February 2, 2007)

Exhibit E:     Transcript of the Deposition of Wendall Evans (April 10, 2007)

Exhibit F:     Transcript of the Deposition of Michel Daly (February 7, 2007)

Exhibit G:     Transcript of the Deposition of Ola Olasehinde (March 15, 2007)

Exhibit H:     Preliminary Report of Plaintiff's Private Security Expert, Norman D. Bates of
               Liability Consultants, Inc. (May 21, 2007)

Exhibit I:     Report of Defendant Zanzibar's Private Security Expert, William T. Gaut
               (June 21, 2007)

Exhibit J:     Defendant Zanzibar's "Security Operations Manual" (September 26, 2006)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREGORY BROADY, | :    CIVIL ACTION |
| | : |
|      Plaintiff | :    NO. 1:06-cv-792 (CKK) |
| | : |
|      v. | : |
| | : |
| ZANZIBAR ON THE WATERFRONT, LLC, | : |
| ALLEN IVERSON and JOHN DOE, | : |
| | : |
|      Defendants. | : |

**DEFENDANT ALLEN IVERSON'S MEMORANDUM OF POINTS & AUTHORITIES
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Pursuant to Fed. R. Civ. P. 56 and LCvR 7(h) and 56.1, Allen Iverson, Defendant in the above-captioned matter (hereinafter referred to herein as "Mr. Iverson"), by and through his undersigned counsel, Alan C. Milstein and Matthew A. Tucker of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., hereby submits the following Memorandum of Points and Authorities in Support of His Motion for Summary Judgment, and says, states, and avers as follows:

## II. RELEVANT FACTUAL AND PROCEDURAL HISTORY

Mr. Iverson hereby incorporates herein by reference the facts and accompanying exhibits set forth in the accompanying Statement of Material Facts in Support of His Motion for Summary Judgment ("SMF").

## III. LEGAL ARGUMENT

### A. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment is appropriately granted when "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1]  Under Rule 56(c), the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."[2]  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[3]  Under such circumstances, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case."[4]

Once the moving party has satisfied its burden, the burden then shifts to nonmoving party, who must "designate 'specific facts showing that there is a genuine issue for trial'" in order to defeat summary judgment.[5]  It is important to note, however, that "[a]lthough a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment."[6]  Rather, "[t]o be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible

---

[1] FED. R. CIV. P. 56(c); see also Tao v. Freeh, 27 F.3d 635, 638 (D.C.Cir.1994)
[2] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
[3] Id. at 322.
[4] Id. at 325.
[5] Id. at 324.
[6]  American Center for Intern. Labor Solidarity v. Federal Ins. Co., 518 F.Supp.2d 163, 167 (D.D.C. 2007) (Kollar-Kotelly, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

evidence that a reasonable trier-of-fact could find for the nonmoving party."[7]  As noted by the Supreme Court, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[8]  In fact, the standard for granting a motion for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict."[9]

### B.    THIS COURT SHOULD GRANT MR. IVERSON'S MOTION FOR SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE AGAINST HIM UNDER ANY AVAILABLE THEORY OF LIABILITY.

In order to evaluate the sufficiency of Plaintiff's causes of actions against Mr. Iverson, it is essential to review Plaintiff's Complaint, which does not delineate any counts or causes of action against either Defendant.  Plaintiff's Complaint recites Mr. Broady's version of the events which took place on the evening of June 4, 2004 at Zanzibar on the Waterfront, LLC ("Zanzibar"), nightclub located on the waterfront in Southwest Washington DC, where Mr. Broady and Mr. Iverson were both present as patrons.[10]  In essence, Plaintiff's complaint alleges that while Plaintiff and Mr. Iverson were both present at Zanzibar, an individual wearing a shirt indicating he was "Security" and identified in the Complaint as "John Doe" began to establish control by "indicating which individuals and patrons go to what parts of the bar and locations,"[11] and that the Defendants are liable for his injuries because either (1) his actions were done with the knowledge of, and/or with the actual ("employee and/or agent") and/or apparent authority of

---

[7] American Center, 518 F.Supp.2d at 167 (D.D.C. 2007) (Kollar-Kotelly, J.) (citing Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C.Cir. 1987); Anderson, 477 U.S. at 251-52 (internal quotation omitted)).

[8] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[9] Anderson, 477 U.S. at 250 (citing Brady v. S. R. Co., 320 U.S. 476, 479-80 (1943)).

[10] Exhibit A at ¶¶1-3.

[11] Id. at ¶5.

Zanzibar and Mr. Iverson,[12] or (2) Defendants "knew or should have known" that allowing their agent/employee John Doe to assume security and "restrict the flow of patrons" would be dangerous and that Zanzibar and Iverson were somehow negligent in hiring, training or supervising him in some manner.[13] There is no indication why Plaintiff did not seek to identify or seek redress from John Doe.

As such, based on Plaintiff's Complaint, there are only two (2) main theories of liability under which Mr. Iverson could potentially be held liable for the injuries sustained by Mr. Broady: (1) a vicarious liability theory, based on some alleged agency relationship between Mr. Iverson and John Doe (the unidentified individual alleged in the Complaint to have caused Plaintiff's injuries); or (2) a theory of Negligent Hiring, Training, and Supervision against Mr. Iverson, alleging that Mr. Iverson breached some unknown duty of care he owed to the Plaintiff by failing to adequately hire, train and supervise the actions of John Doe (addressed in further detail below), which proximately caused Plaintiff's damages. For the reasons that follow, Mr. Iverson is entitled to Summary Judgment because Plaintiff has failed, despite adequate time for discovery, to set forth facts on the record to establish the elements of any potential cause of action against Mr. Iverson based on Plaintiff's Complaint.

1.    **PLAINTIFF'S CLAIMS ALLEGING VICARIOUS LIABILITY AGAINST MR. IVERSON FOR THE ACTIONS OF JOHN DOE FAIL AS A MATTER OF LAW.**

Because Plaintiff's Complaint does not contain a list of counts or causes of action against Mr. Iverson , it is necessary to evaluate any potential theory of liability against Mr. Iverson that can be gleamed from the four corners of the Complaint. Plaintiff's first potential theory of liability against Mr. Iverson based on Plaintiff's Complaint is some theory of vicarious liability

---

[12] Id at ¶¶6-9.
[13] Id. at ¶¶20-22.

for the actions John Doe, who allegedly acted with the authority – whether apparent or actual – of Mr. Iverson.  To recap, Plaintiff's Complaint sets for the following allegations from which a cause of action alleging vicarious liability against Mr. Iverson – albeit a tenuous one – could be set forth:[14]

- ●"[t]he actions of John Doe were known to…Allen Iverson;"[15]

- ●"John Doe was acting as the employee and/or agent of the defendants in directing patrons and controlling the patrons at [Zanzibar];"[16]

- ●"John Doe had the apparent authority of…Allen Iverson to control activity;"[17]

- ●"Allen Iverson knew or should have known that allowing John Doe to restrict, order, and/or place limitations on patrons…would cause contentions with patrons and John Doe;"[18]

- ●"John Doe's restrictions were with the knowledge and authority or apparent authority of…Allen Iverson;"[19]

- ●"John Doe was acting as the agent/employee and with the apparent authority of…Allen Iverson." at the time when he assaulted Plaintiff;"[20] [and therefore]

- ●"Allen Iverson [is] responsible for the actions of John Doe, who was acting as [his] agent/employee at the time;"[21]

Plaintiff has been unable, however, to establish **any** of the foregoing allegations with evidence of record developed throughout the course of discovery in this matter.  In fact, the only allegation in Plaintiff's Complaint that Plaintiff *has* been able to establish (other than placing Mr. Iverson and

---

[14] Of course, this argument assumes as true only the facts plead in the Complaint, which have been denied by Mr. Iverson by way of his Answer to Plaintiff's Complaint.
[15] Exhibit A at ¶6.
[16] Id. at ¶7.
[17] Id. at ¶8
[18] Id. at ¶12
[19] Id. at ¶15.
[20] Id. at ¶¶16-17.
[21] Id. at ¶18.

Mr. Broady at Zanzibar on the evening in question) is that the individual identified as John Doe "came onto the premises at about the same time as Mr. Iverson."[22] on the evening in question. Based solely on this vital piece of information, Plaintiff would like to find Mr. Iverson liable for the actions of John Doe.  In fact, Plaintiff himself – <u>the only person who has testified to having seen the individual known as "John Doe" actually hit him</u> – cannot provide any further information upon which this Court could potentially find Mr. Iverson vicariously liable for the actions of John Doe.  For the reasons that follow, Mr. Iverson is entitled to judgment as a matter of law on any theory of vicarious liability against him because Plaintiff cannot demonstrate that John Doe acted with *any* authority of Mr. Iverson, be it apparent or actual.

### a.    <u>Plaintiff Cannot Establish its Claim That John Doe Acted with the Apparent Authority of Mr. Iverson</u>

According to the Restatement (Second) of Agency, adopted by this Court, "[a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."[23]   The Restatement also notes that apparent authority "is entirely distinct from authority, either express or implied."[24]  Moreover:

> [a]pparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the agent to be authorized. In this respect apparent authority differs from authority since an agent who is authorized can bind the principal to a transaction with a third person who does not believe the agent to be authorized.[25]

This Court has also held that in determining the existence of apparent authority, the

---

[22] Exhibit B at 57:2-7 (Plaintiff stated that Mr. Iverson and "John Doe" arrived "right around the same time.")

[23] <u>Restatement (Second) of Agency</u> § 8 (1958).

[24] <u>Id.</u> at comment a.

[25] <u>Id.</u> at comment c.

following factors must be analyzed:

> (i)    whether the principal can be bound by apparent authority;
>
> (ii)    whether the principal acted in a way that may give rise to an inference that the agent is authorized to act on behalf of the principal; and
>
> (iii)    whether the third party reasonably believed that the agent was acting on behalf of the principal.[26]

Thus, it is clear that the primary focus in determining whether apparent authority exists is whether the third party reasonably believed that the purported agent was authorized to act on behalf of the purported principal.  In making this determination, it is important to note that

> apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.[27]

Finally, [t]he third party seeking to prove the existence of an agency relationship must show that the reliance was to his or her detriment.[28]  Applying the foregoing law to the facts of the record in this case leads to the inevitable conclusion that Plaintiff cannot maintain any claim that John Doe acted with the apparent authority of Mr. Iverson.

First and most importantly, the Plaintiff in this case had no reasonable belief that the purported agent (John Doe), was authorized to act on behalf of the purported principal, Mr. Iverson.  This much can be deduced from his own testimony:

> Q:    As far as you could tell, did [John Doe] appear to be part of Allen Iverson's group?

---

[26] Smith v. Washington Metropolitan Area Transit Authority, 1997 WL 182286 *8 (D.D.C. 1997) (citing Williams v. WMATA, 721 F.2d 1412, 1416 (D.C.Cir. 1983); Drexel Burnham Lambert v. Commodities Futures Trading Comm'n., 850 F.2d 742, 753 (D.C.Cir. 1988).
[27] Restatement (Second) of Agency § 27 (1958).
[28] Wagshal v. Selig, 403 A.2d 338, 344 (D.C. 1979) (citing Gonzalez v. Internacional De Elevadores, S.A., 891 A.2d 227, 238 (D.C. 2006)

A:     I just thought he was security.  I can't distinguish between the two.  I just thought he was security.[29]

. . .

Q:     Did you see Allen Iverson giving directions to the individual you identified as John Doe?

A:     I wasn't around him too long.[30]

. . .

Q:     How do you know that John Doe was acting as the employee of Mr. Iverson on the evening in question?

A:     They appeared around the same time. **I am not aware who he was working for**.[31]

In fact, other portions of Mr. Broady's own testimony (and of course, in the Complaint) alternately indicate that he believed that John Doe (and the two other individuals that he identified as "three guys that were wearing black jeans and a black T-shirt that said Security across the front [in gold lettering]") may have been working for Zanzibar – either as one of its own internal security personnel, or as part of additional security typically hired by Zanizbar when celebrities were expected at the club:

Q:     Had you ever seen security guards at the club wearing black T-shirts with, you said it was a gold lettering that said Security on the front?

A:     Black T-shirts with gold lettering I was saying.  Yes.  I have.  On different occasions where they have special guests I have seen that before.  Yes.

Q:     Were those security people with the guest?  Is that what you are saying?

---

[29] Exhibit B at 57:8-12.
[30] Id. at 120:14-16.
[31] Id. at 121:9-13.

A:      I am not for sure.  Whenever they [Zanzibar] have special guests, sometimes they have additional security and I have seen guys dressed like that before.

. . .

Q:      So, those are people that appear to be protecting the special guests?

A:      I would guess.

Q:      Any idea how many times you have seen those individuals?

A:      Not off the top of my head.  No, sir.

Q:      Do you know if those were the same people that you had seen on previous occasions or just are you talking about seeing people with a black T-shirt hat said Security on the front?

A:      Yes.  Just seeing them.

Q:      When there weren't special guests around though you never noticed any security guards dressed that way?

A:      No, sir.[32]

In fact, although Ola Olasehinde, one of Zanzibar's owners and former security managers, stated in June of 2004 he believed that Zanzibar's internal security staff wore suits and not T-Shirts,[33] he "assumed" and "presumed" that the security blocking the area in which Mr. Iverson was situated was hired by Zanzibar on the evening in question:

Q:      Did Zanzibar, as a matter of course before June 4 of '04, get extra security themselves knowing a star or celebrity would come, to handle the crowd?

---

[32] Id. at 58:17-60:11.

[33] Exhibit G at 33:5-9.  There is conflicting testimony whether, as of June of 2004 , Zanzibar's own internal security personnel wore T-Shirts with the word "Security" emblazoned across the front.  See Exhibit J at p. 14; Exhibit F at 39:22-40:3 (suggesting that they did wear T-Shirts at times and therefore John Doe *could* have been one of Zanzibar's own internal security personnel); but see Exhibit G at 33:5-9; Exhibit E at 29:5-8 (stating that that they wore suits at the time, indicating that John Doe may have been hired by Zanzibar as additional security).

A:     I'm assuming so, but once again I was not involved with the operation.

Q:     Why would you have extra security if you knew a star or celebrity was coming to Zanzibar?

A:     Because we knew probably the crowd will swell.  It would be a little more than normal.  So you want to make sure that you have enough security to make sure that everybody has -- you know.

Q:     Just need extra folks around.  Is that right?

A:     Yeah.

Q:     Do you know if there was any extra security on the night of June 4, 2004 when Allen Iverson was coming provided by Zanzibar?

A:     I presume so, I assume so, but once again I'm not sure.[34]

Moreover, the following testimony also indicates that not only did Plaintiff not know who John Doe worked for at the time of the attack, he had a reasonable belief that John Doe was authorized to act – not by Mr. Iverson – but rather another individual entirely who assumedly worked for Zanzibar:

A:     So, I walked back over to [John Doe].  He said, didn't I tell you get off me?  I am like, the other gentleman told me to come back and talk to you and ask you can I go and just get my cell phone and the lady I am with and I will come on back out, no problem.  I am like, it is getting too crowded anyway.
He said he couldn't help me, to speak to -- and he pointed to this guy.  I don't know if it was his supervisor or manager.  But he said you need to talk to him.  And the guy, it just so happened he was walking past me.  He had dreadlocks.

Q:     Do you know who that was?

---

[34] Exhibit G at 57:15-58:6.

A:      The guy was saying that like that is the person that runs security.

                                    . . .

Q:      Was that person dressed differently or was he also wearing Security?

A:      No.  He was dressed differently.

Q:      Do you know who he was?

A:      I have no clue.

Q:      So, you went up to this person who had dreadlocks and what did you tell him?

A:      I told him that I was over in the area.  I showed him my band.  He said, yes, that is the band to get in, but there is too many people over there.  I told him that my girl is over there with my cell phone, I just want to just tell her to come out.  He is like, stand right here, I will go get her. So, as he walked in –

Q:      Let me just stop you.  You have no idea what the name of this person was?

A:      No.

Q:      Do you have any idea what his relationship was with either Zanzibar or with the security guards?

A:      Well, the security guard, he led me to believe that that was his boss.  **That is the reason why I said his supervisor or his manager.  I can't remember the exact words, but he led me to believe that that was his boss.** [35]

The foregoing testimony makes it clear that Plaintiff cannot establish the first and primary element in determining whether apparent authority exists because he did not have a reasonable belief that John Doe was authorized to act on behalf of Mr. Iverson, but rather believed that John

---

[35] Exhibit B at 63:22-64:17; 65:1-66:3.

Doe was authorized to act on behalf of another individual who John Doe led Plaintiff to believe was his boss, and whoever that dreadlocked individual was, it was <u>not</u> Mr. Iverson.

Even assuming, *arguendo*, that Plaintiff *could* establish that he had a reasonable belief that John Doe was authorized to act on behalf of Mr. Iverson (which he cannot), Plaintiff still cannot establish that he relied on this reasonable belief to his detriment, because there is no testimony that he acted on any such belief to begin with. Rather, Plaintiff testified that he was merely trying to back into the VIP area where he had left his cell phone when he was attacked without provocation by John Doe.[36] There is no evidence, be it deposition testimony or otherwise, to suggest that Plaintiff acted under any belief that John Doe was authorized to act on behalf of Mr. Iverson at the time of the attack, let alone that he did so to his detriment. Accordingly, Plaintiff cannot establish any viable claims based on the allegation that John Doe acted with the apparent authority of Mr. Iverson.

### b. Plaintiff Cannot Establish its Claim That John Doe Acted with the Actual Authority as an Agent or Employee of Mr. Iverson

In order to hold a principal liable for the actions of his/her agent in the District of Columbia, a Plaintiff must establish: (a) the existence of an agency relationship between the principal and the alleged agent; <u>and</u> (b) that the agent was acting within the scope of that relationship when the agent commits a tortuous act.[37] Although "[v]arious labels have been used to describe this type of relationship, including principal-agent, master-servant, and employer-employee….these terms are indistinguishable. The question is simply whether, under the doctrine of *respondeat superior,* the principal/master/employer should be held vicariously liable for the acts or omissions of the agent/servant/employee. Whichever label is used, our analysis

---

[36] <u>Id.</u> at 62:14-67:13

[37] <u>Judah v. Reiner</u>, 744 A.2d 1037, 1039-40 (D.C. 2000) (citing <u>Giles v. Shell Oil Corp.</u>, 487 A.2d 610, 611 (D.C. 1985)).

remains the same."[38]  "Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so."[39]

In determining whether an agency relationship exists under the laws of the District of Columbia, the following factors are considered: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."[40]  Note, however, that in determining whether a principal/employer – agent/employee relationship exists, "[t]he employer's right to control and direct the daily activities of the employee is usually considered 'the determinative factor.'"[41]  Indeed, "[t]he decisive test…is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."[42]  In determining whether a principal/employer maintained a "right to control," courts examine both the intent of the parties – as expressed in any contractual agreement – as well as the parties' actual relationship.[43]  Finally, note that the party asserting the existence of an agency relationship bears the burden of proving it.[44]

In determining whether an agency relationship exists under the laws of the District of Columbia, it is also important to note that there can be no extension of vicarious liability for the allegedly tortious actions of an independent contractor.  Under District of Columbia case law, the "determination    of    whether    an    individual    is    an    employee    or    an    independent

---

[38]  Judah, 744 A.2d at 1037 n. 5 (citing District of Columbia v. Hampton, 666 A.2d 30 (D.C.1995) (using the terms principal-agent and master-servant interchangeably).

[39]  Smith v. Jenkins, 452 A.2d 333, 335 (D.C. 1982) (citations omitted).

[40]  Judah at 1040 (citing LeGrand v. Ins. Co. of N. Am., 241 A.2d 734, 735 (D.C. 1968)).

[41]  Ames v. Yellow Cab of D.C., Inc., 2006 WL 2711546 at *4 (D.D.C. 2006) (citing Hampton, 666 A.2d at 38; Safeway Stores, Inc. v. Kelly, 448 A.2d 856, 860 (D.C. 1982)).

[42]  Legrand, 241 A.2d at 735 (quoting Dovell v. Arundel Supply Corp., 361 F.2d 543, 544 (D.C. Cir. 1966)).

[43]  See Yellow Cab, 2006 WL 2711546 at *4 (citing Hampton, 666 A.2d at 39).

[44]  See Hampton, 666 A.2d at 38.

contractor…involves…analysis of the 'economic realities' of the work relationship."[45]    In

making this determination,

> [c]onsideration of all of the circumstances surrounding the work relationship is essential, and no one factor is determinative. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review…. If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.[46]

As such, although the "right to control" is established as the most decisive factor to review in

determining independent contractor status, the following additional factors are examined as well:

> Additional matters of fact that an agency or reviewing court must consider include, among others, (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.[47]

Applying the foregoing law of the District of Columbia to determine whether an agency

relationship exists based on the facts of record in this case, it is readily apparent that Plaintiff

cannot establish the necessary elements of a cause of action alleging vicarious liability based on

Plaintiff's claims that John Doe acted with the actual authority of Mr. Iverson as his

agent/employee.

---

[45] <u>Spirides v. Reinhardt</u>, 613 F.2d 826, 831 (D.C. Cir. 1979) (internal citations omitted).

[46] <u>Id.</u> at 831-32.

[47] <u>Id.</u> at 832.

Regarding the first factor (the selection and engagement of the servant), there is no evidence in the record that even suggests that Mr. Iverson or any his agents selected or hired John Doe to provide security on the evening in question.

With regard to the second factor (the payment of wages), there are no facts of record indicate that Mr. Iverson or any of his agents paid John Doe to provide security on the evening in question.

Regarding the third factor (the power to discharge) and the fourth power (the power to control the conduct of the employee) it is unclear whether Mr. Iverson had the power to discharge John Doe because there is no evidence that he either selected, nor hired nor paid for his services. Even assuming, *arguendo*, that Mr. Iverson could have discharged John Doe despite not hiring or paying him, consideration must be paid to the fact that there is no testimony that Mr. Iverson himself saw John Doe's attack of the Plaintiff, Mr. Iverson himself has denied witnessing such an attack,[48] and Plaintiff himself suggested that Mr. Iverson may not have been able to do anything even if he *had* witnessed the actions of John Doe, indicating that it was unlikely at best that he had the power to control John Doe either:

> Q:    When you were attempting to return to the SkyClub after using the bathroom, you were stopped by the individual identified as John Doe, correct?
>
> A:    Correct, sir.
>
> Q:    During this time do you know where Mr. Iverson was?
>
> A:    He was right close. You could see him where I was standing. He was right there. He was against the wall.
>
> Q:    So, you could actually see him. All right. Did he do anything when this was going on?

---

[48] See Exhibit D at ¶8 ("I have no recollection of ever being at the Zanzibar where an altercation occurred involving one of my security, anyone traveling with me, or anyone at all.")

A:     There was quite a few people between the security guy and him.[49]

The fifth factor (whether the work is part of the regular business of the employer) is clearly not established in the present case, because providing security is not part of Mr. Iverson regular business as a professional basketball player.  Accordingly, the foregoing factors do not establish a principal/agent and/or employer-employee relationship in the present case. Accordingly, because Plaintiffs have failed to establish the existence of an principal/agent and/or employer/employee relationship between Mr. Iverson and John Doe, Mr. Iverson cannot be held vicariously liable for the allegedly tortious actions of John Doe and judgment as a matter of law should be granted in favor of Mr. Iverson wiith regard to all such causes of action contained in Plaintiff's Complaint.

Moreover, applying the facts of record to the framework for determining whether an individual is an employee or an independent contractor firmly establishes that even if Plaintiff *could* establish that Mr. Iverson had some sort of relationship with John Doe (which based on the facts of record he cannot), Plaintiff could at best establish that John Doe was an independent contractor, which cannot support a claim of vicarious liability against a principal in the District of Columbia.  First, the provision of security for high profile individuals like Mr. Iverson is typically performed by independent security professionals, without supervision.  Second, security professionals typically require certain skills, training and experience not possessed by the average individual, such as the ability to analyze, identify and neutralize threats to security. The third, fourth and fifth factors also suggest independent contractor status in the present case as well, because there is no suggestion that Mr. Iverson furnished any equipment used or the

---

[49] Exhibit B at 122:3-17.  This issue will be re-addressed in Part III(B)(2) below.

place of work, because there is no evidence that John Doe was retained to provide security for Mr. Iverson at any time, let alone on a regular basis or over a significant period of time, and because there is no evidence that Mr. Iverson or any of his agents paid John Doe.  Nor does the evidence support any of the remaining factors which suggest that an individual is an employee as opposed to an independent contractor.  Specifically, there is no evidence whether at annual leave was afforded to John Doe or whether John Doe accumulated retirement benefits (and any such suggestion would be preposterous); it is established that security work was *not* an integral part of the business of Mr. Iverson; there is no evidence whether Mr. Iverson paid John Doe's social security taxes (which is difficult to imagine as well); and it is unknown whether the parties intended to establish independent contractor status for John Doe because there is no evidence that Mr. Iverson selected, retained, paid or even met John Doe.

For all of the foregoing reasons, Mr. Iverson is entitled to the entry of summary judgment regarding any claims of vicarious liability for the actions of John Doe because Plaintiff cannot establish that John Doe acted with any authority of Mr. Iverson, whether real or imagines.

### 2. PLAINTIFF'S CLAIMS ALLEGING NEGLIGENT HIRING, TRAINING, AND SUPERVISION AGAINST MR. IVERSON ALSO FAIL AS A MATTER OF LAW

The second potential theory of liability against Mr. Iverson based on Plaintiff's Complaint is a cause of action for Negligent Hiring Training and Supervision.  At the outset, any cause of action based on Mr. Iverson's negligence must fail as a matter of law because there is no evidence – whether by expert testimony or otherwise – establishing the standard of care owed by Mr. Iverson to Plaintiff Broady.  Under District of Columbia law, such claims require plaintiffs to establish a deviation from a standard of care by expert testimony.  As this Court has stated, "a plaintiff in a negligence action bears the burden of proof on three issues:  the applicable standard of care; a deviation from that standard; and a causal connection between such

deviation and the injury."[50]  This Court further held that "[w]here 'the subject in question is so distinctly related to some science, profession or occupation as to be beyond the knowledge of the average layperson, a negligence plaintiff must present expert testimony to establish the standard of care.'"[51]  This Court, as well as others, has expressly determined that the standard of care for security at a nightclub is one such instance of an occupation outside the knowledge and everyday experience of lay people.[52]

In Edwards, a case analogous to this one, nightclub patrons sued the owner and operator of the nightclub, among others, for negligent supervision and intentional and negligent infliction of emotional distress and assault and battery.  This Court dismissed the claims stating that the lack of expert testimony establishing the requisite duties and level of medical injuries precluded the plaintiffs from recovering.  The Court concluded that "D.C. district and local courts have held that expert testimony is required to establish the standard of care for a claim of negligent hiring, training, and supervision of security personnel."[53]  The Court also stated that "a plaintiff's failure to name an expert constitutes grounds for dismissal."[54]  Here, as in the Edwards case, neither Plaintiff nor Defendant Zanzibar's security experts set forth any standard of care for Mr. Iverson or his security personnel, or their alleged breach of any such standard of care.[55]  As such, Mr. Iverson contends that any cause of action based on his alleged negligent hiring, training or

---

[50] Edwards v. Okie Dokie, Inc., 473 F.Supp.2d 31, 45 (D.D.C. 2007).

[51] Id. (citation omitted).

[52] See, e.g., Predzin v. DC Arena Limited P'ship., No. 02-9582, at *6 (D.C.Sup.Ct. Oct. 7, 2003) (noting that "technical knowledge of the security business and . . . a familiarity with the exercise of professional judgment by trained security officials" are outside the "everyday experiences and understanding of average lay people," so that expert testimony was needed to evaluate what security personnel should have done); see also Hill v. Metropolitan, 779 A.2d 906, 910 (D.C. 2001) (expert testimony necessary for standard of care in crowd control and management).

[53] Edwards, 473 F.Supp.2d at 45 (citing Fletcher v. Dist. of Columbia, No. 01-0297, 2005 WL 670676, *6 (D.D.C. 2005)).

[54] Id. (citation omitted).

[55] See Exhibits H and I.

supervision of John Doe must fail as a matter of law because the first element of any negligence case – duty – cannot be established.

Assuming, *arguendo*, that Plaintiff can establish the existence of some duty owed by Mr. Iverson to Mr. Broady, in order to establish a claim of negligent hiring, training and supervision, in addition to establishing the elements of negligence (namely, a plaintiff must first prove that the defendants had a duty of ordinary care to plaintiffs; that defendants breached that duty of care; and that defendants' breach of their duty was the proximate cause of plaintiffs' cognizable injury), a plaintiff must show that (1) the employer knew or should have known its employee behaved in a dangerous or incompetent manner; and (2) despite actual or constructive knowledge, the employer failed to adequately supervise the employee.[56]   As with Plaintiff's vicarious liability claims, the Plaintiff has failed to establish the essential elements of a negligent hiring, training and supervision claim with any facts of record.

As an initial matter, it is important to note that with regard to each of the elements a negligent hiring, training and supervision, Mr. Iverson denies the existence of an employer/principal and employee/agent relationship for the reasons delineated in Part III(B)(1)(b) above.  In addition, Mr. Iverson argues that apparent authority cannot give rise to a claim of Negligent Hiring, Training & Supervision because order to establish liability for alleged negligent supervision, a jury must first find that the defendant in question "conduct[ed] an

---

[56] See Kivanc v. Ramsey, 407 F.Supp.2d 270, 274 (D.D.C. 2006) (quoting Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C. 1985)).  Note, however, that a "contractor's negligence in conducting the work it was hired to do creates no presumption that the employer was negligent in selecting the contractor."  Fry v. Diamond Construction, Inc., 659 A.2d 241, 248 (D.C. 1995) (internal citation omitted).

activity through servants or other agents."[57]   A cursory review of District of Columbia law leads to the same conclusion:

> [t]o invoke this theory of liability it is incumbent upon a party to show that an employer knew or should have known its *employee* behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.[58]

Assuming, *arguendo*, that Plaintiff can establish the existence of an agency or employment relationship between Mr. Iverson and John Doe (which based on the facts of record he cannot), in the present case, there is no testimony that Mr. Iverson selected, hired, or paid any of the individuals who were allegedly providing security for him on the evening in question. More importantly, however, there is no evidence that Mr. Iverson had any reason to believe that John Doe had previously behaved in a dangerous or incompetent manner or that he would behave that way in the future.  Employers "cannot be liable for negligent hiring if the employer conducts a reasonable investigation into the person's background or if such an investigation would not have revealed any reason not to hire that person."[59]   Here, there is no evidence whatsoever to suggest that Mr. Iverson would have been able to predict whether John Doe had any dangerous propensities even if Mr. Iverson or his agents had conducted a detailed criminal history search of John Doe.  Moreover, similar to the general contractor in Fry, Mr. Wendall Evans, who is believed to have been the individual responsible for overseeing Zanzibar's security operations in June of 2004, had previously encountered Mr. Iverson at Zanzibar on at

---

[57] Restatement (Second) of Agency § 213 (1958).

[58] Giles, 487 A.2d at 613 (emphasis in original) (citing Murphy v. Army Distaff Foundation, Inc., 458 A.2d 61 (D.C. 1983)).

[59] Yellow Cab, 2006 WL 2711546 at *7 (citing Fry, 659 A.2d at 248) (where the court held that a general contractor was not negligent in initially hiring a subcontractor where the general contractor's safety officer previously worked with the subcontractor on similar projects and was reasonably assured of the subcontractors reputation for safety and competent work).

least two prior occasions and that each time, and never experienced any problems with Mr. Iverson or his security in the past (although he could not recall seeing Mr. Iverson's security on the evening in question and may not have been at Zanzibar on that date).[60]

Compounding the total lack of evidence demonstrating that Mr. Iverson was somehow aware of John Doe's predisposition for violence or that he "knew or should have known that allowing John Doe to restrict, order, and/or place limitations on patrons…would cause contentions with patrons,"[61] there is no evidence of record that Mr. Iverson was aware that John Doe behaved in a dangerous or incompetent manner on the evening in question, Mr. Iverson himself has denied any "recollection of ever being at the Zanzibar where an altercation occurred involving one of [his] security, anyone traveling with [him], or anyone at all,"[62] and Plaintiff himself suggested that Mr. Iverson may not have had the opportunity to do anything even if he *had* witnessed the actions of John Doe because there were "quite a few people between the security guy and him."[63]  Moreover, even assuming, *arguendo*, that Mr. Iverson knew or should have known that John Doe would behave in a dangerous or incompetent manner on the evening in question, there is no evidence that Mr. Iverson failed to adequately supervise him, especially considering that eyewitness testimony establishes that the altercation at issue – which took no longer than a few second – took place while Mr. Iverson was inside a cordoned-off area located within the SkyClub portion of Zanzibar, indicating that it would have been difficult for Mr. Iverson to oversee the actions of John Doe.[64]

---

[60] Exhibit E at 34:17-41:9.

[61] Exhibit A at ¶12

[62] Exhibit D at ¶8.

[63] Exhibit B at 122:3-17.

[64] See Exhibit C at 57:21-58:8 (wherein Plaintiff described the area in which he was attempting to re-enter when he encountered John Doe as an area "to the right of the bar…[a]nd it has like a glass or something there and it has two pillars.  And I seen the personnel posted.  One was at the

Finally, even assuming, *arguendo*, that that Mr. Iverson or his manager somehow knew or should have known that John Doe had previously behaved in a dangerous or incompetent manner at any time prior to the attack on Plaintiff, *and* that Mr. Iverson failed to adequately supervise John Doe on the evening in question, Plaintiffs have failed to demonstrate how this alleged breach proximately caused Plaintiffs' damages.

For all of the foregoing reasons, Mr. Iverson is entitled to the entry of summary judgment regarding any claims of negligent hiring, training and supervision for the actions of John Doe because Plaintiff cannot establish any of the essential elements to any such cause of action.

## IV.     CONCLUSION

For all of the foregoing reasons, Mr. Iverson has demonstrated that there are no genuine issues of material fact that would require submission to a jury and that he is entitled to judgment as a matter of law with regard to all of the claims alleged in Plaintiff's Complaint.  Accordingly, Mr. Iverson respectfully requests that this Court enter an Order, in the proposed form accompanying this submission, granting Summary Judgment in favor of Mr. Iverson and against Plaintiff Broady.

---

pillar. One was at the glass to block one side. There was another person on the other side."); <u>see also</u> Exhibit F at 56:12-58:1 (wherein Mr. Daly described the area as "an area of the Sky Club that's somewhat secluded.  It's separate.  If you think of the Sky Club being in an L shape, it would be the bottom leg of the L and it's separated by metal curtains.  So that is an area that's the most secluded in the Sky Club" and "there are two metal curtains that provide entrance and exit to this particular secluded area.  Both -- there were two gentlemen at these, by these curtains"); Exhibit G at 84:22-85:19 (wherein Mr. Olasehinde described the same room as "a section called the MJ room, which the celebrities or whoever is hosting the event will have that area.  It would be cordoned off to just them and their guests, I guess.  And the rest of the sky club would be open to the general public or to invited guests.  But there's a particular area which most of the celebrities have for themselves or people that they might invite to come in to that area…..It's -- it's got mirrors.  It's looking the monument.  It's got two entrances, which you can block off or which sometimes it has a curtain, a see-through type curtain.  And sometimes security is posted at them doors to -- well, security is normally posted at them doors.")

Respectfully submitted,

**SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.**

Dated: _____January 16, 2008_____          By: _____*/s/ Alan C. Milstein*_____
                                           Alan C. Milstein, Esquire
                                           Matthew A. Tucker, Esquire
                                           Fairway Corporate Center
                                           4300 Haddonfield Road - Suite 311
                                           Pennsauken, NJ 08109
                                           Telephone: (856) 662-0700
                                           Facsimile: (856) 488-4744
                                           *Attorneys for Defendant Allen Iverson*