**LIABILITY CONSULTANTS**
*Since 1986*

*Managing the Risk of Crime*

Norman D. Bates, Esq., President
Lara S. Richardson, Esq., Vice President

Boston • Tucson

## BROADY v. ZANZIBAR ON THE WATERFRONT, et al.

## PRELIMINARY OPINION OF NORMAN D. BATES

The following preliminary opinion is an analysis of a premises security claim arising from an assault on June 4, 2004, at the Sky Club at Zanzibar on the Waterfront in Washington, D.C. This analysis was performed by reviewing the documents available to date *(See Exhibit A: Document List]*, an inspection of the site, and the application of my education, training, and experience to the facts of this case *[See Exhibit B: Curriculum Vitae of Norman D. Bates]*.

The methodology for the analysis utilized in this case is consistent with good and accepted practices within the security industry and based on my experience as an expert and consultant *[See Exhibit C: IAPSC Forensic Methodology]*.

A list of my publications is included in the attached Curriculum Vitae. A list of the cases in which I have testified for the preceding four years is attached *[See Exhibit D: List of Cases.]*. I charge $195 per hour for my review and testimony.

Based on the information and documents reviewed to date, my opinions are as follows.

## I. FORCE USED TO EJECT PLAINTIFF WAS UNREASONABLE

The plaintiff, Gregory Broady, was a patron in the Sky Club at the time of this incident. Prior to the altercation in question, Mr. Broady was issued a VIP arm band, had entered the Sky Club, and was seated at a table in the club with friends. There is no evidence that the plaintiff was drinking excessively or acting in any inappropriate way in the club. Evidence indicates that the Defendant had at least one security officer present in the Sky Club at this time.

The Defendant, Zanzibar, had certain policies in effect as pertains to handling of patrons and crowd control issues. According to the security director, Wendall Evans, their policy is that "if someone is acting in a way not becoming to the club, they would very calmly escort that person outside the club and inform them that they can come back the next night as their guest."

*[Deposition of Wendall Evans, p. 42].* Further, no one would be ejected from the club without Evan's approval. *[Deposition of Wendall Evans, p. 45].* Evans testified that they hire "security who stay very calm and know how to use their brain before they use their brawn ... they understand that their primary job is to be a host. At no time were you ever to disrespect a customer. The law is specific, if you put your hands on a customer it's assault. You can't do that, the only way you can touch them is with an open hand ... you cannot grab them, that's assault." *[Deposition of Wendall Evans, p. 69-70].* Further, one of Zanzibar's owners, Michel Daley, testified that they particularly wanted Evans' type [of security] "because he diffused situations verbally rather than physically." *[Deposition of Michel Daley, p. 29].* Also, another owner who further had some security responsibilities, Ola Olasehinde, testified that he drafted language for security at Zanzibar that said "they must conduct themselves in a professional manner, that they act as ushers and hosts, not security and to treat clients with dignity and respect. That if they come into a problem or any incidents ... to be polite and pleasant." *[Deposition of Ola Olasehinde, p. 37]*

Zanzibar further had an established procedure in place to address the use of a celebrity's own security within the facility. "There is generally a conversation with a celebrity's security and they would make sure that while a celebrity's security can protect their client, they also not impede on Zanzibar's ability to handle security for the rest of the facility;" *[Deposition of Michel Daley, p. 56]* "letting people know that it is our house." *[Deposition of Ola Olasehinde, p. 89].* Daley testified that it was okay for Iverson's guard to control the secluded area behind the curtain but only that area and not any other part of the Sky Club. *[Deposition of Michel Daley, p. 60].*

While the plaintiff was a patron in the Sky Club that evening, NBA player Allen Iverson entered the Sky Club with a number of people along with at least three personal bodyguards and was placed by the Zanzibar staff in a reserved area of the Sky Club. Testimony of witnesses indicates that Iverson's bodyguards, who were known to be "very big, real intimidating guys" *[Deposition of Ola Olasehinde, p. 25]* were acting in an aggressive manner toward the club patrons, including pushing and shoving, intimidating actions, and hostile language. One of the owners, Michel Daley, testified that he witnessed Iverson's guards "physically pushing patrons [who were really insistent] back out of the area" and stated that Iverson's guards were aggressive in their efforts to prevent people from getting back to where Allen Iverson was." *[Deposition of Michel Daley, pp. 61-62].* "Iverson's security people were felt to be overly aggressive in their attitude towards others." *[Defendant Zanzibar's Answers to Interrogatories, #10].* Despite the fact that it is Defendant Zanzibar's expectations that "all patrons are expected to behave appropriately and responsibly when at the club ... any individuals who fail to behave or become disruptive are asked to leave." *[Defendant Zanzibar's Answers to Interrogatories, #17].* Despite this fact, Iverson's bodyguards were allowed to remain and be confrontational with other guests in violation of defendant's own policies.

Mr. Broady went to use the restroom and was subsequently assaulted by a security employee while trying to return to the table where he had previously been sitting with his female companion and another friend. There is no evidence that the plaintiff was intoxicated or acting

2

in any manner that would have required his ejection from the club. All available evidence indicates that the plaintiff was merely trying to return to his table when he was stopped and confronted by one of Iverson's personal bodyguards, who would not allow him to pass. The plaintiff proceeded to speak to a number of other unidentified security and club personnel in an effort to return to his seat. There is no evidence that the plaintiff was being in any way confrontational, disruptive, or aggressive toward any other individual. "I did not see Broady do anything to provoke an attack." *[Statement of Danielle Moore, p.3]*

Nightclub industry practices confirm the necessity to use the least amount of force necessary to remove an individual. The research further demonstrates that in the event that a patron is being unruly to the extent that physical force is necessary, the least amount of force should be used.

The following publications contained in this report reflect the national standard for the proper handling of patrons in a nightclub setting:

- It is the policy of this law enforcement agency that officers use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others. It must be stressed that the use of force is not left to the unfettered discretion of the involved officer. This is not a subjective determination. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances ... C. Use of Non-Deadly Force ... 1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control ... 2. Officers are authorized to use department-approved, non-deadly force techniques and issued equipment when one or more of the following apply: a. To protect the officer or others from physical harm; b. To restrain or subdue a resistant individual; c. To bring an unlawful situation safely and effectively under control. *[International Association of Chiefs of Police. Use of Force Model Policy. February 2006.]*

- "Procuring a written policy, signed by each new hire, regarding the use of physical force is essential for several reasons. First of all, it brings the issue to the attention of the employee and shows that you are serious about not causing injury to patrons. Second, it explains to the employee exactly what he can and cannot do in regard to the use of force. Lastly, if an employee does use excessive force, you have a signed document proving the employee knew the rules and was acting outside the scope of your policies and training". *[McManus, Robert A. and O'Toole, Sean M. "The Nightclub, Bar, and Restaurant Security Handbook". Locksley Publishing: 2004. p. 25]*

3

- "Physical force must be used carefully. Any physical contact can result in customer injuries, liability lawsuits, and workers' compensation claims. Customers do not like to be bullied, and customers do not like to see other customers bullied, even if they deserve to be ejected. If security reacts with seemingly excessive force, customers will probably put up a fight and there will be other customers willing to help with the defense. Those that feel mistreated by security may call the police or retreat to their car for a weapon." *[Berkley, Blair J., "Preventing Customer Altercations in Nightclubs". Cornell Hotel and Restaurant Administration Quarterly: 1997. p. 94.]*

- Definition of Restraint: "The officer may apply only the physical restraint necessary to prevent the suspect from escaping from lawful arrest, committing any further criminal act, or inflicting bodily harm on the security officer or any other person."

  Minimum Force: "The officer may apply only the force absolutely necessary to restrain the suspect. The unlawful or unwarranted use of weapons or other physical force by the officer must always be avoided." *[Kehoe, Edward P., "The Security Officer's Handbook: Standard Operation Procedure", 1994.]*

- "Various holds and techniques are available for separation, but remember to train your security to use as little force as possible. The degree of force used should also be less or equal to the amount of force they are responding to; force used by security should not exceed the amount of force the combatants are using." *[McManus, Robert A. and O'Toole, Sean M. "The Nightclub, Bar, and Restaurant Security Handbook". Locksley Publishing: 2004. p. 118.]*

- Policy Toward the Use of Physical Force: "Have your attorney formulate your physical force policy in accordance with your local laws. The information contained in a physical force policy should include:
  -Your company does not condone the use of excessive physical force.
  -When physical force is necessary, we will use the least amount possible. If an employee chooses to ignore these policies, not only will actions be outside the scope of company training and policies, but in direct violation of the law." *[McManus, Robert A. and O'Toole, Sean M. 2004. "The Nightclub, Bar, and Restaurant Security Handbook". Third Edition. p. 25.]*

In no instance is it appropriate for security personnel to strike a patron. Even if the plaintiff had behaved inappropriately in such a way as to justify his removal from the club, the type of force used was inappropriate.

It is presently unclear whether the individual who assaulted the plaintiff was an employee/agent of the club or an employee/agent of Iverson. If he was assaulted by club security personnel, the force used to eject him from the club was excessive and unreasonable and contrary to Zanzibar's established policies for the ejection of guests as referenced above.

4

If the plaintiff was assaulted by one of Iverson's bodyguards, then the defendant Zanzibar improperly relinquished security responsibilities as outlined below.

## II. ZANZIBAR IMPROPERLY ABDICATED SECURITY RESPONSIBILITIES

According to Wendall Evans, the security director for Zanzibar at the time of this incident, "When an entertainer brings his security to the club, his security only interacts with that entertainer. He or she has no control over what we do at the club. We control that." *[Deposition of Wendall Evans, p.34]*. Evans further testified that he would tell the celebrity's security that Zanzibar's security was in charge of the premises because "we still had our working customers who basically paid our salaries ... and we wanted to make sure that we did not infringe upon their rights, the regular customer, and we want to make sure that they were respected at all times." *[Deposition of Wendall Evans, p. 45-46]*.

Despite this policy, the defendant Zanzibar allowed Iverson's security staff to essentially take over security responsibilities in a portion of the Sky Club. Zanzibar violated their own practices and procedures by surrendering the responsibility of security to these unknown individuals. Defendant Zanzibar should have stationed regular club security personnel along with any bodyguards being used by Iverson to ensure the safety of all patrons of the club.

Zanzibar should not have delegated out the responsibility of patron security to unknown security personnel. According to Evans, he had anywhere from one to three of his own security personnel up at the Sky Club during the time that Iverson was present. These are the individuals who should have been responsible for crowd control, for determining who was allowed to enter certain areas of the club, and for ejecting patrons if necessary. Zanzibar was aware that Iverson was coming to the club that evening and should have taken the appropriate steps to ensure that they had sufficient security in the Sky Club to address any crowd control problems they may have without relying on Iverson's personal guards to solely decide who was to be allowed entry into areas of the club.

Industry publications, also reflecting national standards, identify the complications involved with having celebrities enter an establishment with personal bodyguards. In particular, McManus and O'Toole's publication, "The Nightclub, Bar, and Restaurant Security Handbook, 3rd Edition" states:

> "Celebrities and VIP Guests ...When a celebrity wants to go to a nightclub, he or she will either do so announced or unannounced. Preferably, you want a celebrity or someone with the celebrity to call ahead and inform your management that he or she plans to come in. If this is done, your management can make the necessary arrangements to cater to the celebrity (e.g., a private room or area, security designated to protect the celebrity, door arrangements, etc.)" *p. 200*

5

"If a celebrity enters your club with his or her own security or bodyguards, not only must your lead introduce himself to the celebrity and bodyguard, he must assess the bodyguard's attitude. If a celebrity has a professional bodyguard, chances are the bodyguard will telephone ahead so that your security can prepare for the arrival of the celebrity. Once the celebrity arrives, your lead must explain to the bodyguard your club's security procedures and positions. If the bodyguard really is a professional, he will not want to be in your club; he knows it is very difficult to secure a person in such a dark, crowded atmosphere. A professional bodyguard will listen to your lead, make suggestions, and appreciate the help ... Bodyguards are used to working alone or in conjunction with other professionals. He may appreciate the help of your unit, but he will not depend on them; to him, they are just a group of 'bouncers'. Also keep in mind that your unit and a bodyguard have different security objectives. A bodyguard, while not necessarily violent, will protect his client at all costs, whereas your unit must protect everyone in the club. If an altercation erupts, a bodyguard will do whatever necessary to protect his client and will not be thinking about restraint." *p. 201-202*

"Many celebrities, unfortunately, do not hire professional bodyguards but rather friends or the largest men they can find. Unprofessional bodyguards are a security nightmare. As a general rule, if the bodyguard is exceptionally large or intimidating, he is probably not a professional. Unprofessional bodyguards try to intimidate, and in some cases, enjoy hurting people. This type of bodyguard will try to secure his client by himself and not understand that in a nightclub atmosphere, this attitude can get patrons and his client hurt. If faced with an unprofessional bodyguard, your unit will have to secure the celebrity in spite of, not with, the bodyguard. Again, if this bodyguard injures a guest or gets his client hurt, it will not be your fault; yet, your club will receive bad publicity and possibly a lawsuit." *p. 202.*

"Many security employees and bouncers lack the skills to defuse violence. The presence of large, muscular men dressed in black, which is not uncommon for security staff, encourages confrontations with some patrons, while discouraging them with others. Bouncers' very presence may subconsciously signal to some patrons that physical confrontation is an acceptable way to resolve disputes in that bar." *[Scott, Michael S., "Assaults in and Around Bars", Aggressive Bouncers p. 4., COPS, Department of Justice, 2001.]*

Illustrative of their loss of control of the club is the fact that even one of the owners, Michel Daley, has testified that he could not get past Iverson's bodyguards, who stated "I don't care who you are" and had to get permission from an Iverson guard to get into the area where Iverson was located. *[Deposition of Michel Daley, p. 56].*

6

## III. CONCLUSION

Irrespective of whether the security officer who assaulted the plaintiff was an agent of Zanzibar or an agent of Iverson, the type of force used under the circumstances was completely inappropriate. If the assailant was an agent of Iverson, Zanzibar inappropriately delegated security responsibilities to an unknown security force.

These opinions are preliminary in nature based on information available to date and may be modified or supplemented upon further discovery.

Norman D. Bates, Esq.
May 21, 2007

7

# EXHIBIT A

BROADY V. ZANZIBAR ON THE WATERFRONT

# DOCUMENT LIST
(As of May 2, 2007)

1.  Complaint
2.  Defendant, Allen Iverson's Answers to Interrogatoriess
3.  Deposition of Michael Daley, Corporate Designee of Zanzibar
4.  Defendant's Answers to Interrogatories
5.  Plaintiff's Discovery Responses (Answers to Interrogatoriess and Responses to Request for Production of Documents)
6.  Metropolitan P.D.'s Summary of Calls to 700 Water Street (6/5/01-6/4/04)
7.  Deposition of Ola Olasehinde
8.  Deposition of Wendall Evans

# EXHIBIT B

**NORMAN D. BATES, ESQ.**
**591 Sugar Road**
**Bolton, MA 01740**
**Regional Office: Tucson, AZ**
**(978) 779-9906 • Fax (978) 779-9986**
**nbates@liabilityconsultants.com**

## PROFESSIONAL EXPERIENCE

**Liability Consultants, Inc.,** Bolton, Massachusetts (1986 to the present)
**President and Founder**

Provide management and liability consulting services on a wide range of security and crime-related issues. Services have been utilized by both the public and private sectors including school systems, municipalities, colleges, hospitals, hotels, insurance companies, law firms, shopping centers, office parks, manufacturing, parking garages, etc.  The following services are offered:

*Consulting* - Retained to evaluate security programs, risks of workplace violence, crime and risk analysis, liability prevention measures, development of company policies, and response to crisis situations

*Seminars* - Programs are provided to individual businesses and trade associations on a number of crime-related liability problems, communication skills, handling victims of crime, workplace violence, negligent hiring, and response to criminal incidents.  Over 200 seminars have been presented nationwide.

American Society for Industrial Security - Instructor - Certified Protection Professional (CPP) Annual Review Program educational credits (1985 to 2002)
Institute for Real Estate Management - Lecturer for Certified Property Manager (CPM) programs
Trial Lawyer Associations - Instructor - Continuing Legal Education seminars for ATLA, DRI, and other lawyers' associations
CPCU (Chartered Property/Casualty Underwriters) - Certified Instructor of Insurance Education (As of 8/99)

*Expert Witness Services*
Retained in over 40 states for consultation and expert testimony in civil actions involving claims of inadequate security, negligent hiring, workplace violence, and intentional tort conduct for both plaintiff and defense firms

*Research*
Provide research data and analysis in premises security liability problems, crime trends, and security standards

**Northeastern University,** Boston, Massachusetts
**Adjunct Faculty** (1990 to 1995)
**Assistant Professor** (1985 to 1990)

Taught the following graduate and undergraduate courses:
- Introduction to Law & The Legal Process
- Civil Liability & Policy Development
- Civil Liability in Criminal Justice
- Security Administration
- Security Management & Supervision
- Law & Security
- Criminal Law & Procedure
- Legal Aspects of Security Operations
- Introduction to Security
- Criminal Procedure/Due Process

Awards: "Professor of the Year Award" - College of Criminal Justice (June 1989)

**Saunders Hotels Corporation, Inc.**, Boston, Massachusetts
**Director of Security and Legal Counsel** (1985)
**Director of Security** (1979 to 1984)

Responsible for handling loss prevention concerns and legal problems as well as the management of security for the Boston Park Plaza Hotel, the Lenox Hotel, the Copley Square Hotel, and the Plaza Castle Conference Center. Active involvement in all phases of the business in both a legal role as in-house counsel and in security operations as Director of Security.

**Boston Park Plaza Hotel**, Boston, Massachusetts
**Director of Security** (1978 to 1979)

Developed and implemented an in-house security department of twenty-five employees, established recruit and in-service training programs for security personnel, and created a comprehensive policy/procedure security manual and responsible for all other aspects of the company's loss prevention program. Promoted to Corporate Director in 1979.

**Amtrak Railroad Police**, Boston, Massachusetts
**Police Officer** (1977)

Regular police duties in the metropolitan Boston area with statewide police authority in Massachusetts and Rhode Island.

**Massachusetts Criminal Justice Training Counsel**, Boston, Massachusetts
**Staff Assistant** (1976 to 1977)

Assisted in the development and implementation of police training programs and performed a feasibility study of statewide computer applications in training.

**Harvard University Police**, Cambridge, Massachusetts
**Crime Analyst** (1975 to 1977)

Performed statistical crime analysis and incident tracking for specialized police task force.

**LEGISLATION**

<u>Victims' Rights - Crime of Criminal Harassment</u>. Drafted legislation in Massachusetts, relative to the Crime of Stalking. Signed into law August 2000 and found at MGL Chapter 265, Section 43(a).

<u>Shopping Center Security</u> - At the request of a Massachusetts State senator, drafted and testified on behalf of this legislation that was designed to require shopping centers to develop written security plans (1990).

<u>Private Security Licensing and Regulation</u> - At the direction of Massachusetts Governor Dukakis' General Counsel, prepared legislation that would have established standards and state regulation for the licensing and training of private security personnel (1986).

<u>Innkeepers' Rights</u> - Drafted legislation which enhanced the rights of innkeepers, signed into law in September 1985 and found at MGL Chapter 140, section 12 & MGL Chapter 231, Section 94b.

Norman D. Bates, Esq.                                                                                                    2

**BOOKS**

You're Hired! - A Management Guide to Screening New Employees, (working title), Norman D. Bates, Esq., In progress.

Innkeepers' Laws of Massachusetts, Norman D. Bates, Esq., and Jon D. Groussman, J.D., 1995. A guide for the Massachusetts innkeeper to the relevant statutes applicable to the industry. 2nd edition, revised, including restaurants' laws, 1999

Employee Background Investigations: A Guide for Employers, Norman D. Bates, Esq., Jon D. Groussman, J.D., and Michelle A. Lucini, 1994. Developed to assist employers in conducting background investigations. Federal and State laws and sample practices and techniques for performing background investigations included.

**BOOK CHAPTERS**

*"Premises Security Liability"*, Norman D. Bates, Esq., Strategic Security Management, Karim H. Vellani, Butterworth-Heinemann Publishers, Burlington, MA, 2007

*"Insurance and Liability Issues"*, Norman D. Bates, Esq., Security Consulting, 3rd Edition, Charles A. Sennewald, Butterworth Heinemann/Elsevier Publications, Burlington, MA, 2004

*"Foreseeability of Crime and Adequacy of Security"*, Norman D. Bates, Esq., Accident Prevention Manual for Business & Industry, Security Management, National Safety Council, 1997

*"Contemporary Issues in Healthcare Security"*, Norman D. Bates, Esq., and Bonnie S. Michelman, CPP, Security Supervisor's Training Manual, International Association for Hospital Security, 1988

*"Hotel Security"*, Norman D. Bates, Esq., Handbook on Crime Prevention, 2nd Edition, Lawrence J. Fennelly, Butterworth Publishers, Stoneham, MA, 1988

**RESEARCH STUDIES**

Major Developments in Premises Security Liability III (2004), Norman D. Bates, Esq., An in depth evaluation of security related cases reported from 1992 to 2001

Major Developments in Premises Security Liability II (1999), Norman D. Bates, Esq., and Jon D. Groussman, J.D. An interim study of cases from 1993-1997, updating of the original study published 1992

Major Developments in Premises Security Liability - (1983 to 1993), Norman D. Bates, Esq., and Susan J. Dunnell, MS, 1992. Research on the legal development of premises liability for the criminal conduct of third parties and its effect on private industry. Cited by Supreme Court of New Jersey in Clohesy v Ford Circus Supermarket (1997)

**ARTICLES**

*"Major Developments in Premises Security Liability: Recent Survey Findings"*, Norman D. Bates, Journal Healthcare Protection Management, Vol. 22, No. 1, 2006

Norman D. Bates, Esq.                                                                                           3

*"Major Developments in Premises Security Liability: Identifying Weakness Can Reduce Property Owners Risk"*, Norman D. Bates, <u>New England Real Estate Journal</u>, November 25, 2005

*"Major Developments in Premises Security Liability - Consultant's Study Reveals Trends"*, Norman D. Bates, <u>ATLA's Motor Vehicle Collision, Highway & Premises Liability Section</u>, Vol. 11, No. 4, Summer 2005

*"The Verdict Is In"*, Norman D. Bates, <u>Access Controls & Security Systems</u>, April 2005

*"On Guard - Recent Developments in Security Standards"*, Norman D. Bates, <u>Condo Media</u>, June 2005

*"Recent Developments in Nationwide Security Standards: The General Security Risk Assessment Guideline"*, Norman D. Bates, <u>Victim Advocate</u>, Volume 4, Number 2, Fall 2003

*"Workplace Violence and Employer Liability"* Norman D. Bates, <u>CPCU Society Claims Section Quarterly</u>, May 2001

*"Who Should Chart Security's Course?"* Norman D. Bates, <u>Security Management</u>, February 2001

*"More Wins for Defendants in Premises Liability Cases,"* Norman D. Bates, and Jon Groussman, <u>Security Management</u>, February 2000

*"Workplace Violence and Employer Liability,"* Norman D. Bates, <u>Victim Advocate</u>, Winter 2000

*"Reducing Crime at Commercial Sites Can Minimize Landlord's Liability"*, Norman D. Bates, <u>Banker & Tradesman</u>, May 1995

*"The Power of Paperwork"*, Norman D. Bates, <u>Security Management</u>, May 1995

*"Avoiding Negligent Hiring Liability in Property Management"*, Norman D. Bates, <u>Condo Media</u>, September 1994

*"Commercial Properties - Inadequate Security: The New Liability Crisis"*, Norman D. Bates, <u>Skylines Magazine</u>, September 1994

*"Landlords Must Ensure Security"*, Norman D. Bates, <u>Boston Herald</u>, August 1994

*"Commercial Landlords Now Liable for Crime"*, Norman D. Bates, <u>N.E. Real Estate Journal</u>, August 1994

*"Inadequate Security: The New Liability Crisis"*, Norman D. Bates, <u>Journal of Property Management,</u> July/August 1993

*"Inadequate Security Liability"*, Norman D. Bates, <u>Condo Media,</u> July 1993

*"The Liability Crisis of Inadequate Security"*, Norman D. Bates, <u>Maine Housing Managers' Association Fall Quarterly</u>, 1993

*"Risks to Your Guests Can Be Costly for All"*, Norman D. Bates, <u>Boston Business Journal</u>, March 1992

*"Negligent Hiring Liability: A Manageable Risk"*, Norman D. Bates, <u>Soc. for Human Resource Mgmt.</u>, June 1990; published as: *"Understanding the Liability of Negligent Hiring"* <u>Security Management</u>, July 1990

*"Security Expert Crucial in Premises Liability"*, Norman D. Bates, <u>Lawyers Weekly</u>, June 1990

*"The Disarming Question of Arming Guards"*, Norman D. Bates, <u>Security Management</u>, November 1989

*"Special Police Powers: Pros and Cons"*, Norman D. Bates, <u>Security Management</u>, August 1989

*"Contribution - The Emerging Focus in Liquor Liability"*, Norman D. Bates and Roger A. DuPont, <u>Reducing the Toll: An Auto Safety Resource Manual</u>, Insurance Information Institute, November 1988

*"Reducing Liability's Toll"*, Norman D. Bates, <u>Security Management</u>, October 1988

*"High Speed Chase or High Speed Trap?"* Norman D. Bates, <u>Civil Liability Alert,</u> 1988

*"Negligent Hiring Liability"*, Norman D. Bates, Civil Liability Alert, Summer 1988

*"Litigation: A Loss to Prevent"*, Norman D. Bates, <u>Security Management</u>, April 1988

*"Special Police Powers: An Asset or a Liability?"* Norman D. Bates, <u>Civil Liability Alert</u>, 1987

*"Litigation: The Final Evaluation of Security"*, Norman D. Bates, <u>Civil Liability Alert</u>, Fall 1987

*"Investigating Employee Crime -A Dilemma for Employers"*, Norman D. Bates, <u>Civil Liability Alert,</u> 1987

*"Inadequate Security - Trends in Litigation"*, Norman D. Bates, <u>Civil Liability Alert</u>, Spring, 1987

*"Civil Liability Reviewed"*, Norman D. Bates, <u>Civil Liability Alert</u>, Winter 1987

*"Citizen's Power of Arrest - A Legal Update"*, Norman D. Bates, <u>Civil Liability Alert</u>, Winter 1987

*"Rights of Innkeeper's - Changes in the Law"*, Norman D. Bates, <u>Keynotes</u> - Greater Boston Hotel Association, March 1986

*"Hotel's Loss Linked with Security Director's Association"*, Norman D. Bates, <u>Keynotes,</u> - Greater Boston Hotel Association, October 1985

Norman D. Bates, Esq.                                                                                   4

## BOOK AND ARTICLE REVIEWS

*"Workplace Violence: Managing by Violence Risk Assessment & Thoughtful Intervention"*, ASIS International Protection of Assets Manual (Blind Review 5/05).
Proactive Security Management, Pearson Prentice Hall, Upper Saddle River, NJ (Blind review, 11/03).
*"Tourist Industry Liability from Crimes Against International Travelers"*, Daniel Kennedy, Security Journal, March 1999.
Contemporary Lodging Security, Mark Beaudry, Butterworth Heinemann Publishers, Stoneham, MA, 1993.
Security: Adequate...or Not?, Chris E. McGoey, CPP, Aegis Books, Oakland, CA, 1990.
Detecting Deception, Edward Landis and Robert Meyer, The Dorsey Press, Chicago, IL, 1988.

## EDITORIAL BOARDS OF ADVISORS

Editorial Board of Advisors for Brownstone Publishers, New York, New York, for the following publications: Shopping Center Management Insider (10/95 to present), Professional Apartment Management (9/90 to present), Student Housing Management Insider (1/02 to 4/02), Private School Director's Legal Guide (5/01 to 7/03), and School Policy Legal Insider (6/98 to 9/99).

## CIVIL LIABILITY ALERT, Boston, Massachusetts

**Editor** (1986 to 1988)
Editor for this quarterly peer-reviewed publication on liability issues in policing, municipal security, insurance and corrections. Published by the Civil Liability Institute of Massachusetts, Inc.

## STANDARDS DEVELOPMENT

**ASIS International  - Commission on Guidelines**
**Commission Member** (2001 to 2004)
Development of national guidelines for security in the private sector

**American Society for Testing and Materials**, Philadelphia, Pennsylvania
**Chairman** - F12.20 Subcommittee on Premises Security Liability (1992 to 1995)
Development of draft standards for security practices for all types of privately-owned organizations

**International Association of Professional Security Consultants - Best Practices Committee**
**Chairman** (2003 to present)

## ADVISORY COMMITTEES

**University of Massachusetts**, Lowell, Massachusetts
**Member - Advisory Committee** (1993 to 1995)
Security Management Program
**Newbury College**, Brookline, Massachusetts
**Member - Advisory Committee** (1992 to 1995)

Norman D. Bates, Esq.                                                                                                  5

## EDUCATION

*Admitted to the Massachusetts Bar in January 1985*

**Suffolk University Law School**, Boston, Massachusetts
Juris Doctor Degree (1984)

**Northeastern University**, Boston, Massachusetts
Bachelor of Science in Criminal Justice (1978)

**Massachusetts Criminal Justice Training Council**, Boston, Massachusetts
Attended numerous seminars and training programs, including a twelve-week recruit program at the Boston
Police Academy (1977 to 1984)

**Continuing Legal Education Programs** (MCLE, ATLA, DRI)
Professional legal seminars on a variety of issues (1985 to present)

**ASIS International** (1980 to present)
Continuous national and local seminars on a wide range of security topics

## MILITARY

**US Coast Guard** (1969 to 1973)
Petty Officer/Boat Engineer
Port Security; Search and Rescue

## PROFESSIONAL ORGANIZATIONS

**International Association of Professional Security Consultants** - Member (2000 to Present)
Board of Directors (2001 to 2007), Treasurer (2007/08)
**ASIS International** - Member (1979 to Present)
Chairman, Boston Chapter (1993), Vice Chairman, Boston Chapter (1992)
Treasurer, Boston Chapter (1991), Secretary, Boston Chapter (1990)
Program Chairman, Boston Chapter (1989), Academic Committee, National (1990-1991)
C.P.P. Exam Committee (1997-1998) - Legal Aspects Sub-Committee - Exam Question Development
**American Association for Justice** (formerly ATLA) - Associate Member (1980 to present)
**Defense Research Institute** - Member (1996 to present)
**National Crime Victim Bar Association** - Member (2000 to present)
Board of Advisors - (2001 to 2003)
**Southern Arizona Center Against Sexual Assault (SACASA)** - Board Member (2003 to 2006)
**The Society for Human Resource Management (SHRM)** - Member (2003 to 2004)
**Children's Law Center of Massachusetts** - Member, Board of Directors (1988 to 1993)
**Civil Liability Institute of Massachusetts** - Member, Board of Trustees (1986 to 1995)
**Greater Boston Hotel Security Director's Association** - Founder and Former Chairman (1982 to 1985)
**International Lodging Safety and Security Association** - Past Member and Co-Founder
**American and Massachusetts Bar Associations** - Past Member

Norman D. Bates, Esq.                                                                                          6

**MEDIA**

Quoted and interviewed by the <u>Wall Street Journal</u>, <u>New York Times</u>, <u>US News and World Report</u>, USA Today, <u>Security Magazine</u>, <u>Security Management</u>, <u>Lawyers Weekly</u>, <u>The Tonight Show</u>, <u>Geraldo Rivera</u>, <u>CBS News</u>, <u>NBC Nightly News</u>, <u>ABC's 20/20</u>, and numerous other national publications. Frequent interviews on local television news stations and in newspaper stories, commenting on current news stories regarding crime, inadequate security, and liability.

*Revised May 8, 2007*

Norman D. Bates, Esq.

7

# EXHIBIT C

# Best Practice # 2: FORENSIC METHODOLOGY
# June 2000

**The International Association of Professional Security Consultants is issuing this consensus-based and peer-reviewed Best Practice for the guidance of and voluntary use by businesses and individuals who deal or may deal with the issues addressed herein.**

## POSITION STATEMENT

The International Association of Professional Security Consultants does hereby recognize that, on occasion, its members will be called upon to perform as "Forensic Consultants" and serve as "Expert Witnesses" in a court of law.

It should be recognized that the "Forensic Consultant's" task is one of education. The consultant will provide his opinion(s) to the client, to opposing counsel during deposition, in response to written interrogatories, in required reports, and to the judge and jury at trial or in any other lawfully convened hearing. This is done with the goal of making others aware of the security issues and leading to a just and proper conclusion of the litigation.

The responsibility of the "Forensic Consultant" lies with our system of justice and the ethics of the security profession. The "Forensic Consultant" is to be totally independent of any outside pressures or financial considerations conceived to influence the consultant's evaluation of the case at issue.

The "Forensic Consultant" will at all times be forthright, honest and precise in evolving the ultimate conclusion(s) and opinion(s). The opinion will be the result of a review of all documentation, discovery material, site inspections and testing procedures presented by all parties to the litigation.

*The following is to be used in a typical premises security case. It is reasonable to expect variations of the steps, and some steps deleted and others added as the facts and circumstances of the cases warrant.*

## I. RISK ASSESSMENT

A. Review all relevant material that provides information on the premises and surrounding area

1. Discovery

a. Interrogatories

b. Requests for production

c. Affidavits

d. Expert witness reports

e. Depositions

f. Interviews

2. Police

a. Calls for service (grid report)

b. Reports of relevant crimes on the premises (three to five years prior to the date of the incident)

c. Reports of relevant crimes in the surrounding area (two to three years prior to the date of the incident)

d. Other relevant crime history information

3. Media

4. Other sources

B. Inspect site where the incident occurred and the surrounding relevant area

1. Determine layout of the premises

2. Evaluate relevant factors (lighting, lines of sight, places of concealment, remoteness, accessibility, security measures, conditions, etc.)

3. Interview those with knowledge of the incident and/or the premises/surrounding area (this is often covered in depositions, police interviews and private investigators' investigations)

4. Review relevant documentation (lease, contract, diagram, map, etc.)

5. Assess the characteristics of the surrounding area

C. Analyze incident

1. Police report

2. Proprietary incident report

3. Discovery information (see IA1 above)

4. Medical records (emergency room and/or autopsy)

5. Media information

6. Assess for corroboration of plaintiff's story and how the incident occurred

## II. SECURITY SURVEY

Conduct an extensive physical survey of the scene of the incident and areas/functions that are applicable to the incident to achieve a meaningful understanding of information that has potential application.

A. Security Personnel

1. Review security guard(s) actions, staffing levels, post orders, duty hours, equipment provided, tours, evaluations, training, hiring procedures and supervision

2. Review law enforcement presence and actions

3. Review roles and actions of non-security related persons who may have affected the security posture

4. Assess the qualifications and performance of owner/management personnel

B. Security Program

1. Review security related policies and procedures

2. Review all risk assessments performed prior to the date of the incident

3. Review guard logs, job descriptions, incident reports, and internal correspondence

4. Review guard contract

5. Review corporate security manuals

6. Review training manuals and materials

7. Interview parties/review depositions regarding employees' understanding of their duties, and all customs and undocumented practices

8. Review changes to security prior to the incident

9. Evaluate the qualifications and experience of security management and supervisory personnel

C. Security Equipment

1. Review building design and site plans

2. Inspect all security devices related to the incident

3. Inspect all structural security features

4. Determine the position, function and maintenance status of the relevant security equipment and features

5. Determine level of illumination

## III. ANALYSIS

Determine the level of adequacy of security at the location of the incident on the date and at the time the incident occurred. This will be based on the information obtained in the risk assessment and security survey, and the application of a qualitative analysis based on experience, education and training.

## IV. CONCLUSION

Based upon the analysis, reach conclusions on the issues of foreseeability, preventability and causation (as used in the security profession). At this point the expert has formed opinions and is prepared to provide a written report, be deposed and/or testify at trial.

## V. REPORT

Write a report with opinions of foreseeability/preventability/causation when requested by counsel or required by the court. Include detailed bases of findings.

NOTE:  The IAPSC membership in attendance at the annual meeting on May 2, 2005 voted, without objection or abstention to adopt the additions to the Best Practice.

LEGAL NOTICE/DISCLAIMER: Copyright © 2002 - 2006 The International Association of Professional Security Consultants (IAPSC), All Rights Reserved. The IAPSC makes no representations concerning the guidelines contained herein which are provided for informational and educational purposes only, and which are not to be considered as legal advice. The IAPSC specifically disclaims all liability for any damages alleged to result from or arise out of any use or misuse of these guidelines.

# EXHIBIT D

**Norman D. Bates, Esq.**
**Expert Witness Testimony**
**During Preceding Four Years**
**May 17, 2007**

| CASE NAME | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|
| Arce v Quest<br>Tampa, Florida, 2005 | X | |
| Bailey v Lockheed Martin<br>Atlanta, Georgia, 2006 | X | |
| Blanks v Lockheed Martin<br>Atlanta, Georgia, 2007 | X | |
| Beckham v The Adam's Mark Hotel<br>Charlotte, North Carolina, 2005 | X | |
| Brown v Sunoco<br>Charleston, West Virginia, 2004 and<br>2006 | X | |
| Bryan v Hidden Hollow Apartments<br>Atlanta, Georgia, 2007 | X | |
| Bruce v Days Inn<br>Fort Wayne, Indiana, 2007 | X | |
| Carlson v Raleigh Housing Authority<br>Raleigh, North Carolina, 2004 | X | X |
| Castellanos v 131 Kensington Properties<br>Jersey City, New Jersey, 2006 | | |
| Cates v Draper & Kramer<br>St. Louis, Missouri, 2005 | X | X |
| Catino v Merservey<br>Worcester, Massachusetts, 2003 | | X |
| Chance v AMLI<br>Marshall, Texas, 2007 | X | X |
| Creighton v Green Oak Apartments<br>Chicago, Illinois, 2004 | X | |
| Davis v Motel 6<br>Washington, DC. 2007 | X | |

| CASE NAME | DEPOSITION | TRIAL TESTIMONY |
|---|---|---|
| Davis v Snowden<br>Las Vegas, Nevada, 2004 | X | X |
| Deacon v Santa Barbara City College<br>Santa Barbara, California, 2006 | X | |
| DeYoung v A Massage II<br>Denver, Colorado, 2005 | X | |
| Doe v Clayton Estates<br>Nashville, Tennessee, 2003 | X | |
| Doe v Gonzales, Fiore Bus<br>Boston, Massachusetts, 2003 | X | |
| Doe v MARTA<br>Atlanta, Georgia, 2006 and 2007 | X | X |
| Doroshenko v Budget Suites of America<br>Las Vegas, Nevada, 2005 | X | |
| Dunbar v Paris Hotel<br>Las Vegas, Nevada, 2003 | X | X |
| Ferro v Marriott<br>Boston, Massachusetts, 2003 | X | |
| Foster v The Palace<br>Boston, Massachusetts, 2005 | X | |
| Fuentes v Trump Marina<br>Philadelphia, Pennsylvania, 2003 | X | X |
| Garley v Albertson's<br>Las Vegas, Nevada, 2005 | X | |
| Gupta v Cinemark<br>Dallas, Texas, 2003 | X | |
| January v Thicket Apartments<br>Atlanta, Georgia, 2004 | X | |
| Kierce v Awde, Inc.<br>Dedham, Massachusetts, 2003 | | X |
| Knysz v Douglas Lee Bay<br>Pontiac, Michigan, 2004 | X | X |

2

# Snee, Dupray & Parrish

Not a Partnership
9401 Lee Highway
Suite 206
Tina L. Snee & Associates, PLLC          Fairfax, VA  22031
Dupray & Dupray, PLLC                        (703) 352-8833
Parrish Law Firm, PLLC                    Fax (703) 352-8881

May 21, 2007

Andrew B. Greenspan, Esquire          Alan C. Milstein, Esq.
Law Office of Andrew B. Greenspan     Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.
8600 LaSalle Road                     4300 Haddonfield Road, Suite 311
Oxford Bldg. - Suite 620              Pennsauken, NJ  08109
Towson, MD 21286

> Re:    Broady v. Zanzibar on the Waterfront
>        Case no. 2006 CA 01774 B
>        Our file no. 44178

Dear Counsel:

Enclosed please find a copy of our expert report from Norman Bates.

Sincerely,

Tina L. Snee

TLS/dls

Enclosure

## TINA L. SNEE AND ASSOCIATES, P.L.L.C.
9401 Lee Highway, Suite 206
Fairfax, Virginia 22031
(703) 352-8833
Fax: (703) 352-8881

# FAX COVER SHEET

To:          Andrew Greenspan, Esq.           (410) 339-4641
             Alan Milstein, Esq.              (856) 662-0165

From:        Tina L. Snee, Esq.

Client/Matter:   Broady v. Zanzibar               Our file no. 44178
                 Case no. 1:06-cv-00792-RMC

Date:        May 21, 2007

No. of pages (including this cover sheet)          9

COMMENTS:   Report only to follow.  Exhibits to follow by regular mail.

# Snee, Dupray & Parrish

Not a Partnership
9401 Lee Highway
Suite 206
Fairfax, VA  22031
(703) 352-8833
Fax (703) 352-8881

Tina L. Snee & Associates, PLLC
Dupray & Dupray, PLLC
Parrish Law Firm. PLLC

May 21, 2007

Andrew B. Greenspan, Esquire
Law Office of Andrew B. Greenspan
8600 LaSalle Road
Oxford Bldg. - Suite 620
Towson, MD 21286

Alan C. Milstein, Esq.
Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.
4300 Haddonfield Road, Suite 311
Pennsauken, NJ  08109

Re:    Broady v. Zanzibar on the Waterfront
       Case no. 2006 CA 01774 B
       Our file no. 44178

Dear Counsel:

Enclosed please find a copy of our expert report from Norman Bates.

Sincerely,

Tina L. Snee

TLS/dls

Enclosure



*Managing the Risk of Crime*

Norman D. Bates, Esq., President
Lara S. Richardson, Esq., Vice President

Boston • Tucson

## BROADY v. ZANZIBAR ON THE WATERFRONT, et al.

## PRELIMINARY OPINION OF NORMAN D. BATES

The following preliminary opinion is an analysis of a premises security claim arising from an assault on June 4, 2004, at the Sky Club at Zanzibar on the Waterfront in Washington, D.C. This analysis was performed by reviewing the documents available to date *(See Exhibit A: Document List]*, an inspection of the site, and the application of my education, training, and experience to the facts of this case *[See Exhibit B: Curriculum Vitae of Norman D. Bates]*.

The methodology for the analysis utilized in this case is consistent with good and accepted practices within the security industry and based on my experience as an expert and consultant *[See Exhibit C: IAPSC Forensic Methodology]*.

A list of my publications is included in the attached Curriculum Vitae. A list of the cases in which I have testified for the preceding four years is attached *[See Exhibit D: List of Cases.]*. I charge $195 per hour for my review and testimony.

Based on the information and documents reviewed to date, my opinions are as follows.

## I. FORCE USED TO EJECT PLAINTIFF WAS UNREASONABLE

The plaintiff, Gregory Broady, was a patron in the Sky Club at the time of this incident. Prior to the altercation in question, Mr. Broady was issued a VIP arm band, had entered the Sky Club, and was seated at a table in the club with friends. There is no evidence that the plaintiff was drinking excessively or acting in any inappropriate way in the club. Evidence indicates that the Defendant had at least one security officer present in the Sky Club at this time.

The Defendant, Zanzibar, had certain policies in effect as pertains to handling of patrons and crowd control issues. According to the security director, Wendall Evans, their policy is that "if someone is acting in a way not becoming to the club, they would very calmly escort that person outside the club and inform them that they can come back the next night as their guest."

*[Deposition of Wendall Evans, p. 42].* Further, no one would be ejected from the club without Evan's approval. *[Deposition of Wendall Evans, p. 45].* Evans testified that they hire "security who stay very calm and know how to use their brain before they use their brawn ... they understand that their primary job is to be a host. At no time were you ever to disrespect a customer. The law is specific, if you put your hands on a customer it's assault. You can't do that, the only way you can touch them is with an open hand ... you cannot grab them, that's assault." *[Deposition of Wendall Evans, p. 69-70].* Further, one of Zanzibar's owners, Michel Daley, testified that they particularly wanted Evans' type [of security] "because he diffused situations verbally rather than physically." *[Deposition of Michel Daley, p. 29].* Also, another owner who further had some security responsibilities, Ola Olasehinde, testified that he drafted language for security at Zanzibar that said "they must conduct themselves in a professional manner, that they act as ushers and hosts, not security and to treat clients with dignity and respect. That if they come into a problem or any incidents ... to be polite and pleasant." *[Deposition of Ola Olasehinde, p. 37]*

Zanzibar further had an established procedure in place to address the use of a celebrity's own security within the facility. "There is generally a conversation with a celebrity's security and they would make sure that while a celebrity's security can protect their client, they also not impede on Zanzibar's ability to handle security for the rest of the facility;" *[Deposition of Michel Daley, p. 56]* "letting people know that it is our house." *[Deposition of Ola Olasehinde, p. 89].* Daley testified that it was okay for Iverson's guard to control the secluded area behind the curtain but only that area and not any other part of the Sky Club. *[Deposition of Michel Daley, p. 60].*

While the plaintiff was a patron in the Sky Club that evening, NBA player Allen Iverson entered the Sky Club with a number of people along with at least three personal bodyguards and was placed by the Zanzibar staff in a reserved area of the Sky Club. Testimony of witnesses indicates that Iverson's bodyguards, who were known to be "very big, real intimidating guys" *[Deposition of Ola Olasehinde, p. 25]* were acting in an aggressive manner toward the club patrons, including pushing and shoving, intimidating actions, and hostile language. One of the owners, Michel Daley, testified that he witnessed Iverson's guards "physically pushing patrons [who were really insistent] back out of the area" and stated that Iverson's guards were aggressive in their efforts to prevent people from getting back to where Allen Iverson was." *[Deposition of Michel Daley, pp. 61-62].* "Iverson's security people were felt to be overly aggressive in their attitude towards others." *[Defendant Zanzibar's Answers to Interrogatories, #10].* Despite the fact that it is Defendant Zanzibar's expectations that "all patrons are expected to behave appropriately and responsibly when at the club ... any individuals who fail to behave or become disruptive are asked to leave." *[Defendant Zanzibar's Answers to Interrogatories, #17].* Despite this fact, Iverson's bodyguards were allowed to remain and be confrontational with other guests in violation of defendant's own policies.

Mr. Broady went to use the restroom and was subsequently assaulted by a security employee while trying to return to the table where he had previously been sitting with his female companion and another friend. There is no evidence that the plaintiff was intoxicated or acting

2

in any manner that would have required his ejection from the club. All available evidence indicates that the plaintiff was merely trying to return to his table when he was stopped and confronted by one of Iverson's personal bodyguards, who would not allow him to pass. The plaintiff proceeded to speak to a number of other unidentified security and club personnel in an effort to return to his seat. There is no evidence that the plaintiff was being in any way confrontational, disruptive, or aggressive toward any other individual. "I did not see Broady do anything to provoke an attack." *[Statement of Danielle Moore, p.3]*

Nightclub industry practices confirm the necessity to use the least amount of force necessary to remove an individual. The research further demonstrates that in the event that a patron is being unruly to the extent that physical force is necessary, the least amount of force should be used.

The following publications contained in this report reflect the national standard for the proper handling of patrons in a nightclub setting:

- It is the policy of this law enforcement agency that officers use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others. It must be stressed that the use of force is not left to the unfettered discretion of the involved officer. This is not a subjective determination. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances ... C. Use of Non-Deadly Force ... 1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control ... 2. Officers are authorized to use department-approved, non-deadly force techniques and issued equipment when one or more of the following apply: a. To protect the officer or others from physical harm; b. To restrain or subdue a resistant individual; c. To bring an unlawful situation safely and effectively under control. *[International Association of Chiefs of Police. Use of Force Model Policy. February 2006.]*

- "Procuring a written policy, signed by each new hire, regarding the use of physical force is essential for several reasons. First of all, it brings the issue to the attention of the employee and shows that you are serious about not causing injury to patrons. Second, it explains to the employee exactly what he can and cannot do in regard to the use of force. Lastly, if an employee does use excessive force, you have a signed document proving the employee knew the rules and was acting outside the scope of your policies and training". *[McManus, Robert A. and O'Toole, Sean M. "The Nightclub, Bar, and Restaurant Security Handbook". Locksley Publishing: 2004. p. 25]*

3

- "Physical force must be used carefully. Any physical contact can result in customer injuries, liability lawsuits, and workers' compensation claims. Customers do not like to be bullied, and customers do not like to see other customers bullied, even if they deserve to be ejected. If security reacts with seemingly excessive force, customers will probably put up a fight and there will be other customers willing to help with the defense. Those that feel mistreated by security may call the police or retreat to their car for a weapon." *[Berkley, Blair J., "Preventing Customer Altercations in Nightclubs", Cornell Hotel and Restaurant Administration Quarterly: 1997. p. 94.]*

- Definition of Restraint:  "The officer may apply only the physical restraint necessary to prevent the suspect from escaping from lawful arrest, committing any further criminal act, or inflicting bodily harm on the security officer or any other person."

  Minimum Force: "The officer may apply only the force absolutely necessary to restrain the suspect. The unlawful or unwarranted use of weapons or other physical force by the officer must always be avoided." *[Kehoe, Edward P., "The Security Officer's Handbook: Standard Operation Procedure", 1994.]*

- "Various holds and techniques are available for separation, but remember to train your security to use as little force as possible. The degree of force used should also be less or equal to the amount of force they are responding to; force used by security should not exceed the amount of force the combatants are using." *[McManus, Robert A. and O'Toole, Sean M. "The Nightclub, Bar, and Restaurant Security Handbook". Locksley Publishing: 2004. p. 118.]*

- Policy Toward the Use of Physical Force: "Have your attorney formulate your physical force policy in accordance with your local laws. The information contained in a physical force policy should include:
  -Your company does not condone the use of excessive physical force.
  -When physical force is necessary, we will use the least amount possible. If an employee chooses to ignore these policies, not only will actions be outside the scope of company training and policies, but in direct violation of the law." *[McManus, Robert A. and O'Toole, Sean M. 2004. "The Nightclub, Bar, and Restaurant Security Handbook". Third Edition. p. 25.]*

In no instance is it appropriate for security personnel to strike a patron. Even if the plaintiff had behaved inappropriately in such a way as to justify his removal from the club, the type of force used was inappropriate.

It is presently unclear whether the individual who assaulted the plaintiff was an employee/agent of the club or an employee/agent of Iverson. If he was assaulted by club security personnel, the force used to eject him from the club was excessive and unreasonable and contrary to Zanzibar's established policies for the ejection of guests as referenced above.

4

If the plaintiff was assaulted by one of Iverson's bodyguards, then the defendant Zanzibar improperly relinquished security responsibilities as outlined below.

## II. ZANZIBAR IMPROPERLY ABDICATED SECURITY RESPONSIBILITIES

According to Wendall Evans, the security director for Zanzibar at the time of this incident, "When an entertainer brings his security to the club, his security only interacts with that entertainer. He or she has no control over what we do at the club. We control that." *[Deposition of Wendall Evans, p.34]*. Evans further testified that he would tell the celebrity's security that Zanzibar's security was in charge of the premises because "we still had our working customers who basically paid our salaries ... and we wanted to make sure that we did not infringe upon their rights, the regular customer, and we want to make sure that they were respected at all times." *[Deposition of Wendall Evans, p. 45-46]*.

Despite this policy, the defendant Zanzibar allowed Iverson's security staff to essentially take over security responsibilities in a portion of the Sky Club. Zanzibar violated their own practices and procedures by surrendering the responsibility of security to these unknown individuals. Defendant Zanzibar should have stationed regular club security personnel along with any bodyguards being used by Iverson to ensure the safety of all patrons of the club.

Zanzibar should not have delegated out the responsibility of patron security to unknown security personnel. According to Evans, he had anywhere from one to three of his own security personnel up at the Sky Club during the time that Iverson was present. These are the individuals who should have been responsible for crowd control, for determining who was allowed to enter certain areas of the club, and for ejecting patrons if necessary. Zanzibar was aware that Iverson was coming to the club that evening and should have taken the appropriate steps to ensure that they had sufficient security in the Sky Club to address any crowd control problems they may have without relying on Iverson's personal guards to solely decide who was to be allowed entry into areas of the club.

Industry publications, also reflecting national standards, identify the complications involved with having celebrities enter an establishment with personal bodyguards. In particular, McManus and O'Toole's publication, "The Nightclub, Bar, and Restaurant Security Handbook, 3rd Edition" states:

> "Celebrities and VIP Guests ...When a celebrity wants to go to a nightclub, he or she will either do so announced or unannounced. Preferably, you want a celebrity or someone with the celebrity to call ahead and inform your management that he or she plans to come in. If this is done, your management can make the necessary arrangements to cater to the celebrity (e.g., a private room or area, security designated to protect the celebrity, door arrangements, etc.)" *p. 200*

5

"If a celebrity enters your club with his or her own security or bodyguards, not only must your lead introduce himself to the celebrity and bodyguard, he must assess the bodyguard's attitude. If a celebrity has a professional bodyguard, chances are the bodyguard will telephone ahead so that your security can prepare for the arrival of the celebrity. Once the celebrity arrives, your lead must explain to the bodyguard your club's security procedures and positions. If the bodyguard really is a professional, he will not want to be in your club; he knows it is very difficult to secure a person in such a dark, crowded atmosphere. A professional bodyguard will listen to your lead, make suggestions, and appreciate the help ... Bodyguards are used to working alone or in conjunction with other professionals. He may appreciate the help of your unit, but he will not depend on them; to him, they are just a group of 'bouncers'. Also keep in mind that your unit and a bodyguard have different security objectives. A bodyguard, while not necessarily violent, will protect his client at all costs, whereas your unit must protect everyone in the club. If an altercation erupts, a bodyguard will do whatever necessary to protect his client and will not be thinking about restraint." *p. 201-202*

"Many celebrities, unfortunately, do not hire professional bodyguards but rather friends or the largest men they can find. Unprofessional bodyguards are a security nightmare. As a general rule, if the bodyguard is exceptionally large or intimidating, he is probably not a professional. Unprofessional bodyguards try to intimidate, and in some cases, enjoy hurting people. This type of bodyguard will try to secure his client by himself and not understand that in a nightclub atmosphere, this attitude can get patrons and his client hurt. If faced with an unprofessional bodyguard, your unit will have to secure the celebrity in spite of, not with, the bodyguard. Again, if this bodyguard injures a guest or gets his client hurt, it will not be your fault; yet, your club will receive bad publicity and possibly a lawsuit." *p. 202.*

"Many security employees and bouncers lack the skills to defuse violence. The presence of large, muscular men dressed in black, which is not uncommon for security staff, encourages confrontations with some patrons, while discouraging them with others. Bouncers' very presence may subconsciously signal to some patrons that physical confrontation is an acceptable way to resolve disputes in that bar." *[Scott, Michael S., "Assaults in and Around Bars", Aggressive Bouncers p. 4., COPS, Department of Justice, 2001.]*

Illustrative of their loss of control of the club is the fact that even one of the owners, Michel Daley, has testified that he could not get past Iverson's bodyguards, who stated "I don't care who you are" and had to get permission from an Iverson guard to get into the area where Iverson was located. *[Deposition of Michel Daley, p. 56].*

6

## III. CONCLUSION

Irrespective of whether the security officer who assaulted the plaintiff was an agent of Zanzibar or an agent of Iverson, the type of force used under the circumstances was completely inappropriate. If the assailant was an agent of Iverson, Zanzibar inappropriately delegated security responsibilities to an unknown security force.

These opinions are preliminary in nature based on information available to date and may be modified or supplemented upon further discovery.

Norman D. Bates, Esq.
May 21, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREGORY BROADY,                              )
                                             )
           Plaintiff,                        )
                                             )
v.                                           )          Case No. 1:06-cv-00792-RMC
                                             )
ZANZIBAR ON THE WATERFRONT, LLC,             )
et al.                                       )
                                             )
           Defendants.                       )

### LINE

PLEASE TAKE NOTICE that on May 21, 2007 Plaintiff Gregory Broady, in the above-captioned matter, by and through counsel, served via fax and regular mail, postage prepaid, the expert report of Norman Bates on the following:

Alan C. Milstein, Esq.
Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.
4300 Haddonfield Road, Suite 311
Pennsauken, NJ 08109

Andrew B. Greenspan, Esquire
Law Office of Andrew B. Greenspan
8600 LaSalle Road
Oxford Bldg. - Suite 620
Towson, MD 21286

TINA L. SNEE & ASSOCIATES, PLLC

Tina L. Snee, Esq (DCB 416191)
Roopal Gupta, Esq. (DCB 485781)
9401 Lee Highway, Suite 206
Fairfax, VA 22031
(703) 352-8833
(703) 352-8881 (fax)

## Linda Trump

| | |
|---|---|
| **From:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Sent:** | Tuesday, May 22, 2007 9:51 AM |
| **To:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Subject:** | Activity in Case 1:06-cv-00792-RMC BROADY v. ZANZIBAR ON THE WATERFRONT, L.L.C. et al Notice (Other) |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### District of Columbia

## Notice of Electronic Filing

The following transaction was entered by Snee, Tina on 5/22/2007 at 9:50 AM and filed on 5/22/2007
**Case Name:**       BROADY v. ZANZIBAR ON THE WATERFRONT, L.L.C. et al
**Case Number:**     1:06-cv-792
**Filer:**           GREGORY BROADY
**Document Number:** 16

**Docket Text:**
NOTICE *Line* by GREGORY BROADY (Snee, Tina)

**1:06-cv-792 Notice has been electronically mailed to:**

Alex M. Grant    agrant@nationwide.com

Andrew B. Greenspan    greensa@nationwide.com

Alan C. Milstein    amilstein@sskrplaw.com, ltrump@sskrplaw.com

Tina L. Snee    tsnee@va-legal.com

**1:06-cv-792 Notice will be delivered by other means to::**

Matthew A. Tucker
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
Fairway Corporate Center
4300 Haddonfield Road
Suite 311
Pennsauken, NJ 08109

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** T:\tls\44178 Broady v. Zanzibar\Federal court case\Line (expert report of N. Bates).pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=5/22/2007] [FileNumber=1441207-0]
[2b7a6ca9a3fea2af386e83a61617471f5bb7c050b950226cfb42b1fb3a1231c6acd1
1a15f49b41ee6cfdd9f3ff6f8af64612c0dcbec2635a8806d5577b01f61d]]