# EXHIBIT 5

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

GREGORY BROADY,

    Plaintiff,

v.                                                    Civil Action No.: 06-0001774

ZANZIBAR ON THE WATERFRONT, LLC

and

JOHN DOE

    Defendants.

## REPORT OF EXPERT WITNESS

Following are my findings and opinions in the above styled case. My opinions are based, among other things, on my review of documents listed below and made a part of this report. Additionally, the following listed sources were also used as a basis for my opinions. Those publications or documents listed below which are too voluminous or costly to include herein are identified and their sources provided.

1. Certain State Statutes.
2. My personal and professional experience as a nationally recognized Security Training instructor.
3. My personal and professional experience as a command level supervisor for a public Law Enforcement Agency.
4. My education in the field of Law Enforcement and Criminal Justice.
5. My teaching experience and education in the disciplines of Criminal Justice and Private & Proprietary Security.
6. My experience as owner and operator of a multi-state approved Security Training Corporation.
7. The Security Handbook by Philip P. Purpura, 2003, pub: Butterworth & Heinemann.
8. Contemporary Security Management by John J. Fay, 2002, pub: Butterworth & Heinemann.
9. Introduction to Security by Robert J. Fischer & Gion Green, 1998, pub:

1

Butterworth & Heinemann.
10. The Effective Security Officer's Training Manual by Ralph F. Brislin, 1998, pub: Butterworth & Heinemann.
11. Zanzibar on the Waterfront Security Operations Manual.
12. Norman Bates Expert Report.
13. Complaint.
14. PLAINTIFF'S ANSWERS TO DEFENDANT ZANZIBAR ON THE WATERFRONT'S INTERROGATORIES.
15. DEFENDANT ALLEN IVERSON'S ANSWERS & OBJECTIONS TO PLAINTIFF'S INTERROGATORIES & REQUEST FOR PRODUCTION OF DOCUMENTS.
16. ANSWERS TO INTERROGATORIES; Exhibits Daley-2 and Daley-3.
17. Deposition Transcript of Darien Green.
18. Deposition Transcript of Zanzibar on the Waterfront by Michel Daley.
19. Deposition Transcript of Allen Iverson.
20. Deposition Transcript of Ola Olasehinde.
21. Deposition Transcript of Gregory Broady.
22. Deposition Transcript of Wendall Evans.
23. Statement of Danielle Moore dated August 16, 2005.
24. Statement of Cynthia Denise McDaniel dated August 17, 2005.
25. Statement of Gregory Lawrence Broady dated August 16, 2005.
26. "Preventing Customer Altercations in Nightclubs" by Blair J. Berkley; Cornell Hotel & Restaurant Administration Quarterly – April 1, 1997.
27. The Nightclub, Bar and Restaurant Security Handbook by McManus & O'Toole, 3rd Edition; Café Press.

In my testimony, I may refer to any of the facts, data, or standards included in documents or data referenced herein or attached hereto and documents or data received after this date. I may also use any of the documents, standards, or data referenced herein as exhibits in my testimony.

A copy of my current resume is attached (attachment #1) for the purpose of determining my qualifications to speak to this matter. I have been accepted and provided testimony as an expert in this discipline. My compensation as an expert in this matter is as follows:

1. $175.00 per hour for all time expended with respect to review of this case and,
2. $250.00 per hour for all time expended in deposition or testimony and,
3. $50.00 per hour for all port to port travel time and,
4. Reimbursement for all out of pocket expenses incurred for travel and/or lodging.

My understanding of the facts in this case, as articulated by Gregory Broady, is summarized as follows:

On June 4, 2004, Gregory Broady went to the Zanzibar on the Waterfront restaurant and nightclub located in Washington, DC. After having dinner with two friends, they were all given access to the Sky Club, a restricted VIP area within the establishment. While there, a sports celebrity, Allen Iverson, arrived with a party of friends and

2

4103394641   Nationwide Insurance                               03:48:48 p.m.   06-28-2007      4 /12

private security personnel. Zanzibar managers cordoned off a section of the Sky Club with metal curtains for the exclusive use of Mr. Iverson and his party. The entrance to the restricted area was then controlled by Iverson's security team and one security guard was posted at the entrance to control entry to the area.

Mr. Broady and two of his companions were seated inside the restricted area prior to Mr. Iverson's arrival and were allowed to remain in the area. After a period of time, Mr. Broady left the restricted area to use the bathroom and was denied access back into the restricted area when he returned. Mr. Broady explained to the first Iverson's security officer that he wanted to return to the area because his female companion was inside and because he left his cell phone at the table. He was again denied entry, referred to a secondary security officer, and told that the other security officer would notify his companion and retrieve the cell phone. Mr. Broady states that while he attempted to direct the second security officer to his companion's location, the first Iverson security officer suddenly struck him in the face causing a serious injury.

After review of the materials previously listed, and based on my education, training and experience in public and proprietary security and public law enforcement, to a reasonable degree of certainty, my findings and opinions in the above styled case are:

1. There was no breach of duty by the defendant, Zanzibar on the Waterfront, that caused or contributed to the injury sustained by Gregory Broady.

2. The injury to Gregory Broady was a sudden and unexpected event that was not reasonably foreseeable or reasonably preventable.

3. There was no excessive force applied to Gregory Broady by any manager, employee, or anyone acting on behalf of the defendant, Zanzibar on the Waterfront.

The bases for my findings and opinions are:

All facts and circumstances of this incident are taken from the statements of Gregory Broady. I have found no other witnesses or supportive evidence to corroborate the allegations made by Mr. Broady. One witness, Danielle Moore, stated that she saw Mr. Broady being struck by a security officer that she thought "was one of Alan Iverson's guys" (pg3). She does not report hearing any of the conversation or seeing any other actions.

Although Mr. Broady states that the assault was completely unprovoked, Ms. Moore states:

"I could just see that the conversation seemed to be getting pretty escalated..."

indicating that there was a confrontation immediately prior to the altercation. Her further view of the incident is questionable in that she reports seeing Mr. Broady struck one time whereas Mr. Broady reports being struck twice.

3

Another witness identified by Mr. Broady was Cynthia Denise McDaniel. Mr. Broady describes Ms. McDaniel as his date for the evening and the person he later called to retrieve his cell phone and accompany him to the hospital. She was attributed as saying "What happened to you" upon meeting Mr. Broady at his car. Ms. McDaniel stated:

> "...**there was this big commotion right at the entrance** to the VIP section. And people was just crowding all around everywhere, but I did see a guy swing, but I didn't know that it was actually involving Greg until later on" [emphasis added].

After the incident was described by Mr. Broady, Ms. McDaniel stated:

> "so then I realized that it was him that had gotten hit or **was in the scuffle** that happened at the Zanzibar" [emphasis added].

She further stated that she did not know if the persons "swinging" were or were not security officers or even part of Mr. Iverson's party. Ms. McDaniel describes multiple people throwing multiple punches [emphasis added]:

> Q. Okay, but it was **people** with Allen Iverson then, **who were swinging the punches**, is that what you're telling me?
>
> A. Well, no I don't know if **they** were the actual **ones** that was **swinging the punches**, but **they** were at the entrance to the VIP section, I know, along with some of the guards at the Zanzibar.
>
> Q. Okay, well that's what I was going to ask you. Those **individuals** who were actually throwing the **punches**, do you know, were **they** security for the Zanzibar or were **they** with Allen Iverson's entourage?
>
> A. No, I can't say if **they** were.

I next examined the circumstances leading up to and during the injury to Mr. Broady to determine whether or not the defendant, Zanzibar on the Water, adequately performed the duty to reasonably provide for the safety and well being of patrons to that establishment.

Deposition testimony contributed from Darien Green, Ola Olasehinde, Michel Daley, and Wendall Evans indicated that the defendant, Zanzibar, had a security staff of 10-13 officers and a security manager. Testimony confirms that background checks were made on all potential security officers prior to employment and that Zanzibar preferred to hire retired police officers and experienced security officers for the security staff.

In accordance with generally accepted industry standards, security officers were placed at facility entrances, interior control points, elevators, Sky Club, outside and included roving officers inside the club. Patrons were "carded" prior to entrance to insure age limitations. Security officers were provided with walkie-talkies for communication.

To provide an "upscale" atmosphere, security officers were required to dress in suits or jackets and wear prominently displayed identification. In accordance with recommended standards, officers were encouraged to avoid confrontations by keeping a low profile and always treating the Zanzibar customer "with complete dignity and respect."

Training was conducted on a regular basis through a plan of frequent meetings with security staff where any security issues would be addressed. The Security Manager states that he was working on a written Security Operations Manual during this period and my conclusion is that the standards within that manual were most likely discussed at the aforementioned meetings.

I saw no evidence of excessive calls for police service during the time of this incident, nor in the period preceding the incident. Zanzibar employees and security personnel were instructed to call the 911 emergency number whenever necessary.

In terms of this incident, there is evidence that Zanzibar security officers and manager interacted with security personnel employed through/by Allen Iverson. Zanzibar owners and security manager stated that Zanzibar security generally will coordinate with celebrity security to accomplish the joint mission of security for all concerned. Mr. Daley stated that they would never allow celebrity security to control any area inside the Zanzibar exclusive of Zanzibar security. That is evidenced through statements and deposition testimony indicating that Zanzibar security personnel and management accessed the Iverson restricted area regularly on the night of this incident.

There is evidence that a Zanzibar owner was initially denied access to the area by an Iverson security officer who did not know the owner's identity. That is a common occurrence. A security officer should never admit an unknown person simply because the person says "I'm the owner." The correct procedure is to positively identify the person prior to admittance. Once his identity was verified, the Zanzibar owner was immediately admitted into the restricted area.

Though there is no evidence to suggest that security in the Zanzibar Sky Club was entirely delegated to Iverson, to suggest that a celebrity may not control an exclusive area within an establishment is not in keeping with generally established industry standards. The best example is that of a celebrity entertainer in a concert setting. Although the facility, such as a public coliseum, may have its own internal security force, there are areas that are restricted to the public and areas that may be restricted and controlled solely by the entertainer's security team. In such events it is not uncommon for the celebrity security team to prohibit even facility security personnel from admittance. It is not uncommon for similar security procedures to be applied to a nightclub setting.

There is no evidence that any other area within the Zanzibar establishment was controlled by any member of the Iverson security team. Further, as related above, there is no evidence that Zanzibar relinquished or abdicated security responsibilities in any way to the Iverson security team for the area set aside for the Iverson party.

My next examination pertained to the actual event in which Mr. Broady was alleged to have been assaulted. Ignoring the fact that Mr. Broady's account of the circumstances is contradicted by his

5


companions, and there were no corroborating witnesses, it seems clear that Mr. Broady left the restricted area and was later denied reentry.

Mr. Broady clearly states that the reason for the denial was that the area was overcrowded. In his deposition testimony and his statement of August 16, 2005, Broady states that he was told by a an unknown security officer:

> ...he was very polite – He said, "Sir, there's too many people in [the] area. Let me go get your cell phone. Stay right here. I'll be right back." (Stmt pg 3) and

> "I showed him my band. He said, yes, that is the band to get in, but there is too many people over there."

It seems clear that the reason for denial to the area was because of an overcrowding situation. Had the security officer admitted Mr. Broady into the area under those circumstances, it would have been a serious breach of security protocol. The actions taken by the security officer were correct and in keeping with security industry standards.

The next action by Mr. Broady is unclear. Broady states that he was fully cooperative and was struck by the Iverson security officer without warning. During his statement and deposition testimony I noted that Mr. Broady acknowledges being told at least five times to "back off" or "get off me" by the Iverson security officer. Broady further states that there was a very large crowd trying to enter the restricted area and that there was "pushing and shoving" as the crowd attempted entry and the security officer prohibited entry. This is further corroborated by Ms. McDaniel's statement. It is unclear how Mr. Broady was able to circumvent the crowd and approach the security officer directly but there is a clear implication that he was insistent that he be allowed entry past the Iverson Security officer.

It appears that a second security officer told Mr. Broady that he [the security officer] would make the necessary notification and retrieve the cell phone telling Broady to "wait right there. I'll be right back."

Rather than following the instructions, it appears that Broady attempted by pass the Iverson officer to intervene and give further directions to the second security officer. Stating "So I went and pointed to tell him no, it was the other direction, and as I dropped my hand, I looked out my peripheral vision and seen someone swinging at me," it appears that Broady gave some animated directions using his hand or arm in front of the Iverson guard. One can only speculate as to any interpretation of such action by the guard.

With one security officer inside the restricted area, and the other stating that he could not leave his assigned position, it seems reasonable, to a certain degree of certainty, that if he was assaulted in the manner claimed, it could have only been by the first Iverson security officer.

Following the claimed altercation between himself and the Iverson security guard, I saw no evidence that Mr. Broady was ejected from the Zanzibar nightclub. Mr. Broady stated that a witness identified only as "Nate" saw him taken to the Sky Club elevator by two unknown

6

security officers. He remembers finding himself on the elevator and deciding to go to the garage to use his other cell phone. There is no mention or indication by Mr. Broady that he was ejected from Zanzibar's or that there was even a Zanzibar employee or security officer present in the elevator.

Finally, it is well known in both private/proprietary security and in public law enforcement that It is not possible to prevent all crimes. It is not uncommon for crimes to be committed with security or police officers actually present. These are referred to as sudden unexpected occurrences and recognized as not foreseeable or preventable offenses.

In the case of private security, one has to examine the circumstances of the event and the circumstances leading up to the event in order to determine if a particular event was reasonably foreseeable and thereby reasonably preventable. In this case, I know of no valid evidence that the mere presence of a celebrity figure in a nightclub setting results in an increase in crime or lead a reasonable person to believe that such a presence would be an indicator of a future assault.

In this case, I looked to see if there was any prior knowledge on the part of Zanzibar owners, management, or security staff suggesting that the presence of Allen Iverson or his security staff would increase the possibility of a criminal assault. I found no such evidence.

Zanzibar owner Michel Daley stated that he had no adverse knowledge of Allen Iverson or his security team prior to this incident date. There is no mention by Zanzibar owner Darien Green of any adverse knowledge of Allen Iverson or his security team prior to this incident date. Zanzibar Owner/Manager Ola Olasehinde stated that he has never seen the Iverson security team, known as the "Four Horsemen," act aggressively or hit anyone. There was no mention by Zanzibar Security Manager Wendall Evans of any adverse knowledge of Allen Iverson or his security team prior to this incident date. In fact, Allen Iverson, along with his security team had been to the Zanzibar on at least one prior occasion without incident.

In terms of force used by an unprofessional private bodyguard, in the book <u>The Nightclub, Bar, and Restaurant Security Handbook</u>, the author writes "if the bodyguard injures a guest or gets his client hurt, it will not be your [the nightclub's] fault; yet your club will receive bad publicity and possibly a lawsuit." Mr. Broady describes the assault as an unexpected event. If the assault against Gregory Broady happened exactly as described by him, it was a sudden, unexpected incident that could not have been reasonably foreseen or prevented by Zanzibar owners, managers, or security personnel.

This concludes my findings and opinions in this case based on examination of documents to this date. I respectfully reserve the right to modify my opinions based on the receipt and examination of additional information.

_____                              6-21-2007
William T. Gaut                                              Date

7