# EXHIBIT 6



Managing the Risk of Crime

Norman D. Bates, Esq., President
Lara S. Richardson, Esq., Vice President

Boston • Tucson

# BROADY v. ZANZIBAR ON THE WATERFRONT, et al.

# PRELIMINARY OPINION OF NORMAN D. BATES

The following preliminary opinion is an analysis of a premises security claim arising from an assault on June 4, 2004, at the Sky Club at Zanzibar on the Waterfront in Washington, D.C. This analysis was performed by reviewing the documents available to date *(See Exhibit A: Document List)*, an inspection of the site, and the application of my education, training, and experience to the facts of this case *[See Exhibit B: Curriculum Vitae of Norman D. Bates]*.

The methodology for the analysis utilized in this case is consistent with good and accepted practices within the security industry and based on my experience as an expert and consultant *[See Exhibit C: IAPSC Forensic Methodology]*.

A list of my publications is included in the attached Curriculum Vitae. A list of the cases in which I have testified for the preceding four years is attached *[See Exhibit D: List of Cases.]*. I charge $195 per hour for my review and testimony.

Based on the information and documents reviewed to date, my opinions are as follows.

## I. FORCE USED TO EJECT PLAINTIFF WAS UNREASONABLE

The plaintiff, Gregory Broady, was a patron in the Sky Club at the time of this incident. Prior to the altercation in question, Mr. Broady was issued a VIP arm band, had entered the Sky Club, and was seated at a table in the club with friends. There is no evidence that the plaintiff was drinking excessively or acting in any inappropriate way in the club. Evidence indicates that the Defendant had at least one security officer present in the Sky Club at this time.

The Defendant, Zanzibar, had certain policies in effect as pertains to handling of patrons and crowd control issues. According to the security director, Wendall Evans, their policy is that "if someone is acting in a way not becoming to the club, they would very calmly escort that person outside the club and inform them that they can come back the next night as their guest."

*[Deposition of Wendall Evans, p. 42].* Further, no one would be ejected from the club without Evan's approval. *[Deposition of Wendall Evans, p. 45].* Evans testified that they hire "security who stay very calm and know how to use their brain before they use their brawn ... they understand that their primary job is to be a host. At no time were you ever to disrespect a customer. The law is specific, if you put your hands on a customer it's assault. You can't do that, the only way you can touch them is with an open hand ... you cannot grab them, that's assault." *[Deposition of Wendall Evans, p. 69-70].* Further, one of Zanzibar's owners, Michel Daley, testified that they particularly wanted Evans' type [of security] "because he diffused situations verbally rather than physically." *[Deposition of Michel Daley, p. 29].* Also, another owner who further had some security responsibilities, Ola Olasehinde, testified that he drafted language for security at Zanzibar that said "they must conduct themselves in a professional manner, that they act as ushers and hosts, not security and to treat clients with dignity and respect. That if they come into a problem or any incidents ... to be polite and pleasant." *[Deposition of Ola Olasehinde, p. 37]*

Zanzibar further had an established procedure in place to address the use of a celebrity's own security within the facility. "There is generally a conversation with a celebrity's security and they would make sure that while a celebrity's security can protect their client, they also not impede on Zanzibar's ability to handle security for the rest of the facility;" *[Deposition of Michel Daley, p. 56]* "letting people know that it is our house." *[Deposition of Ola Olasehinde, p. 89].* Daley testified that it was okay for Iverson's guard to control the secluded area behind the curtain but only that area and not any other part of the Sky Club. *[Deposition of Michel Daley, p. 60].*

While the plaintiff was a patron in the Sky Club that evening, NBA player Allen Iverson entered the Sky Club with a number of people along with at least three personal bodyguards and was placed by the Zanzibar staff in a reserved area of the Sky Club. Testimony of witnesses indicates that Iverson's bodyguards, who were known to be "very big, real intimidating guys" *[Deposition of Ola Olasehinde, p. 25]* were acting in an aggressive manner toward the club patrons, including pushing and shoving, intimidating actions, and hostile language. One of the owners, Michel Daley, testified that he witnessed Iverson's guards "physically pushing patrons [who were really insistent] back out of the area" and stated that Iverson's guards were aggressive in their efforts to prevent people from getting back to where Allen Iverson was." *[Deposition of Michel Daley, pp. 61-62].* "Iverson's security people were felt to be overly aggressive in their attitude towards others." *[Defendant Zanzibar's Answers to Interrogatories, #10].* Despite the fact that it is Defendant Zanzibar's expectations that "all patrons are expected to behave appropriately and responsibly when at the club ... any individuals who fail to behave or become disruptive are asked to leave." *[Defendant Zanzibar's Answers to Interrogatories, #17].* Despite this fact, Iverson's bodyguards were allowed to remain and be confrontational with other guests in violation of defendant's own policies.

Mr. Broady went to use the restroom and was subsequently assaulted by a security employee while trying to return to the table where he had previously been sitting with his female companion and another friend. There is no evidence that the plaintiff was intoxicated or acting

2

in any manner that would have required his ejection from the club. All available evidence indicates that the plaintiff was merely trying to return to his table when he was stopped and confronted by one of Iverson's personal bodyguards, who would not allow him to pass. The plaintiff proceeded to speak to a number of other unidentified security and club personnel in an effort to return to his seat. There is no evidence that the plaintiff was being in any way confrontational, disruptive, or aggressive toward any other individual. "I did not see Broady do anything to provoke an attack." *[Statement of Danielle Moore, p.3]*

Nightclub industry practices confirm the necessity to use the least amount of force necessary to remove an individual. The research further demonstrates that in the event that a patron is being unruly to the extent that physical force is necessary, the least amount of force should be used.

The following publications contained in this report reflect the national standard for the proper handling of patrons in a nightclub setting:

- It is the policy of this law enforcement agency that officers use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others. It must be stressed that the use of force is not left to the unfettered discretion of the involved officer. This is not a subjective determination. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances ... C. Use of Non-Deadly Force ... 1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control ... 2. Officers are authorized to use department-approved, non-deadly force techniques and issued equipment when one or more of the following apply: a. To protect the officer or others from physical harm; b. To restrain or subdue a resistant individual; c. To bring an unlawful situation safely and effectively under control. *[International Association of Chiefs of Police. Use of Force Model Policy. February 2006.]*

- "Procuring a written policy, signed by each new hire, regarding the use of physical force is essential for several reasons. First of all, it brings the issue to the attention of the employee and shows that you are serious about not causing injury to patrons. Second, it explains to the employee exactly what he can and cannot do in regard to the use of force. Lastly, if an employee does use excessive force, you have a signed document proving the employee knew the rules and was acting outside the scope of your policies and training". *[McManus, Robert A. and O'Toole, Sean M. "The Nightclub, Bar, and Restaurant Security Handbook". Locksley Publishing: 2004. p. 25]*

3

- "Physical force must be used carefully. Any physical contact can result in customer injuries, liability lawsuits, and workers' compensation claims. Customers do not like to be bullied, and customers do not like to see other customers bullied, even if they deserve to be ejected. If security reacts with seemingly excessive force, customers will probably put up a fight and there will be other customers willing to help with the defense. Those that feel mistreated by security may call the police or retreat to their car for a weapon." *[Berkley, Blair J., "Preventing Customer Altercations in Nightclubs". Cornell Hotel and Restaurant Administration Quarterly: 1997. p. 94.]*

- Definition of Restraint: "The officer may apply only the physical restraint necessary to prevent the suspect from escaping from lawful arrest, committing any further criminal act, or inflicting bodily harm on the security officer or any other person."

  Minimum Force: "The officer may apply only the force absolutely necessary to restrain the suspect. The unlawful or unwarranted use of weapons or other physical force by the officer must always be avoided." *[Kehoe, Edward P., "The Security Officer's Handbook: Standard Operation Procedure", 1994.]*

- "Various holds and techniques are available for separation, but remember to train your security to use as little force as possible. The degree of force used should also be less or equal to the amount of force they are responding to; force used by security should not exceed the amount of force the combatants are using." *[McManus, Robert A. and O'Toole, Sean M. "The Nightclub, Bar, and Restaurant Security Handbook". Locksley Publishing: 2004. p. 118.]*

- Policy Toward the Use of Physical Force: "Have your attorney formulate your physical force policy in accordance with your local laws. The information contained in a physical force policy should include:
  -Your company does not condone the use of excessive physical force.
  -When physical force is necessary, we will use the least amount possible. If an employee chooses to ignore these policies, not only will actions be outside the scope of company training and policies, but in direct violation of the law." *[McManus, Robert A. and O'Toole, Sean M. 2004. "The Nightclub, Bar, and Restaurant Security Handbook". Third Edition. p. 25.]*

In no instance is it appropriate for security personnel to strike a patron. Even if the plaintiff had behaved inappropriately in such a way as to justify his removal from the club, the type of force used was inappropriate.

It is presently unclear whether the individual who assaulted the plaintiff was an employee/agent of the club or an employee/agent of Iverson. If he was assaulted by club security personnel, the force used to eject him from the club was excessive and unreasonable and contrary to Zanzibar's established policies for the ejection of guests as referenced above.

4

If the plaintiff was assaulted by one of Iverson's bodyguards, then the defendant Zanzibar improperly relinquished security responsibilities as outlined below.

## II. ZANZIBAR IMPROPERLY ABDICATED SECURITY RESPONSIBILITIES

According to Wendall Evans, the security director for Zanzibar at the time of this incident, "When an entertainer brings his security to the club, his security only interacts with that entertainer. He or she has no control over what we do at the club. We control that." *[Deposition of Wendall Evans, p.34]*. Evans further testified that he would tell the celebrity's security that Zanzibar's security was in charge of the premises because "we still had our working customers who basically paid our salaries ... and we wanted to make sure that we did not infringe upon their rights, the regular customer, and we want to make sure that they were respected at all times." *[Deposition of Wendall Evans, p. 45-46]*.

Despite this policy, the defendant Zanzibar allowed Iverson's security staff to essentially take over security responsibilities in a portion of the Sky Club. Zanzibar violated their own practices and procedures by surrendering the responsibility of security to these unknown individuals. Defendant Zanzibar should have stationed regular club security personnel along with any bodyguards being used by Iverson to ensure the safety of all patrons of the club.

Zanzibar should not have delegated out the responsibility of patron security to unknown security personnel. According to Evans, he had anywhere from one to three of his own security personnel up at the Sky Club during the time that Iverson was present. These are the individuals who should have been responsible for crowd control, for determining who was allowed to enter certain areas of the club, and for ejecting patrons if necessary. Zanzibar was aware that Iverson was coming to the club that evening and should have taken the appropriate steps to ensure that they had sufficient security in the Sky Club to address any crowd control problems they may have without relying on Iverson's personal guards to solely decide who was to be allowed entry into areas of the club.

Industry publications, also reflecting national standards, identify the complications involved with having celebrities enter an establishment with personal bodyguards. In particular, McManus and O'Toole's publication, "The Nightclub, Bar, and Restaurant Security Handbook, 3rd Edition" states:

> "Celebrities and VIP Guests ...When a celebrity wants to go to a nightclub, he or she will either do so announced or unannounced. Preferably, you want a celebrity or someone with the celebrity to call ahead and inform your management that he or she plans to come in. If this is done, your management can make the necessary arrangements to cater to the celebrity (e.g., a private room or area, security designated to protect the celebrity, door arrangements, etc.)" *p. 200*

"If a celebrity enters your club with his or her own security or bodyguards, not only must your lead introduce himself to the celebrity and bodyguard, he must assess the bodyguard's attitude. If a celebrity has a professional bodyguard, chances are the bodyguard will telephone ahead so that your security can prepare for the arrival of the celebrity. Once the celebrity arrives, your lead must explain to the bodyguard your club's security procedures and positions. If the bodyguard really is a professional, he will not want to be in your club; he knows it is very difficult to secure a person in such a dark, crowded atmosphere. A professional bodyguard will listen to your lead, make suggestions, and appreciate the help ... Bodyguards are used to working alone or in conjunction with other professionals. He may appreciate the help of your unit, but he will not depend on them; to him, they are just a group of 'bouncers'. Also keep in mind that your unit and a bodyguard have different security objectives. A bodyguard, while not necessarily violent, will protect his client at all costs, whereas your unit must protect everyone in the club. If an altercation erupts, a bodyguard will do whatever necessary to protect his client and will not be thinking about restraint." *p. 201-202*

"Many celebrities, unfortunately, do not hire professional bodyguards but rather friends or the largest men they can find. Unprofessional bodyguards are a security nightmare. As a general rule, if the bodyguard is exceptionally large or intimidating, he is probably not a professional. Unprofessional bodyguards try to intimidate, and in some cases, enjoy hurting people. This type of bodyguard will try to secure his client by himself and not understand that in a nightclub atmosphere, this attitude can get patrons and his client hurt. If faced with an unprofessional bodyguard, your unit will have to secure the celebrity in spite of, not with, the bodyguard. Again, if this bodyguard injures a guest or gets his client hurt, it will not be your fault; yet, your club will receive bad publicity and possibly a lawsuit." *p. 202.*

"Many security employees and bouncers lack the skills to defuse violence. The presence of large, muscular men dressed in black, which is not uncommon for security staff, encourages confrontations with some patrons, while discouraging them with others. Bouncers' very presence may subconsciously signal to some patrons that physical confrontation is an acceptable way to resolve disputes in that bar." *[Scott, Michael S., "Assaults in and Around Bars", Aggressive Bouncers p. 4., COPS, Department of Justice, 2001.]*

Illustrative of their loss of control of the club is the fact that even one of the owners, Michel Daley, has testified that he could not get past Iverson's bodyguards, who stated "I don't care who you are" and had to get permission from an Iverson guard to get into the area where Iverson was located. *[Deposition of Michel Daley, p. 56].*

6

## III. CONCLUSION

Irrespective of whether the security officer who assaulted the plaintiff was an agent of Zanzibar or an agent of Iverson, the type of force used under the circumstances was completely inappropriate. If the assailant was an agent of Iverson, Zanzibar inappropriately delegated security responsibilities to an unknown security force.

These opinions are preliminary in nature based on information available to date and may be modified or supplemented upon further discovery.

Norman D. Bates, Esq.
May 21, 2007